92 F.3d 1313
 45 Fed. R. Evid. Serv. 442
 UNITED STATES of America, Appellee,
v.
Matthew TAYLOR, Defendant,
Darren Nelson, a/k/a "Big-D"; Ezra Clarke; Shannon
Richards; Angel Alonso, a/k/a A.J.; Ruben
Collazo; and Merton Taylor, a/k/a
"Mert", Defendants-Appellants.
 Nos. 1130, 1103, 1101, 1215, 1149, 1175, Dockets 95-1318,
95-1319, 95-1320, 95-1428, 95-1429, 95-1441.
 United States Court of Appeals,
Second Circuit.
 Argued March 25, 1996.
Decided Aug. 16, 1996.
 
 Mark B. Gombiner, New York City, Legal Aid Society, Federal Defender Division, Appeals Bureau, for Defendant-Appellant Ezra Clarke.
 Nicholas M. De Feis, New York City (De Feis, O'Connell & Rose, P.C., of Counsel), for Defendant-Appellant Darren Nelson.
 Sam A. Schmidt, New York City, (Barocas & Schmidt, P.C., of counsel), for Defendant-Appellant Shannon Richards.
 Ephraim Savitt, New York City, for Defendant-Appellant Ruben Collazo.
 Perry S. Reich, Lindenhurst, NY, for Defendant-Appellant Merton Taylor.
 Russell J. Carbone, Kew Gardens, NY (Malerba, Carbone & LaSala, Esqs., of counsel), for Defendant-Appellant Angel Alonso.
 Barbara D. Underwood, Brooklyn, NY, Chief Assistant U.S. Attorney for Eastern District of New York (Zachary W. Carter, United States Attorney for the E.D. of New York, of counsel), for Appellee.
 Ruth A. Nordenbrook, Brooklyn, NY, Assistant U.S. Attorney for E.D. of New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, of counsel), for Appellee.
 Before: NEWMAN, Chief Judge, FEINBERG and PARKER, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Defendants Darren Nelson, Ezra Clarke, Shannon Richards, Angel Alonso, Ruben Collazo and Merton Taylor appeal from convictions for violating 18 U.S.C. § 1951, the Hobbs Act, following a jury trial before Judge Edward R. Korman in the United States District Court for the Eastern District of New York. They assert a variety of errors relating to jury selection, evidentiary rulings, jury instructions, sufficiency of the evidence against them and sentencing. For the reasons stated below, the convictions are affirmed.
 
 Background
 
 2
 Defendants, all of whom are Black or Latino, were members of or associated with an organization commonly known as United Brooklyn. United Brooklyn was one of a number of "minority labor coalitions," or simply "coalitions," operating throughout New York City in the late 1980's and early 1990's. Defendants and the government have fundamentally different views as to the purpose of the coalitions' activities. Defendants view the coalitions as attempting to increase the employment opportunities for their Black and Latino members in the New York construction industry, an industry that in their view discriminates against minorities in its hiring practices. In the government's view, the purpose of the coalitions, at least at some point in time, became the extortion of money, jobs and subcontracts from construction contractors, primarily in an effort to enrich coalition leaders. However the ends are characterized, the means included such direct action as demonstrations and other disruptions (sometimes violent) at construction sites around New York City.
 
 
 3
 In June 1993 defendants, along with 25 others, were charged in an indictment alleging a conspiracy among a number of coalitions to divide New York City among themselves in order to commit extortion against construction contractors working in their respective areas. Various defendants were also charged with substantive extortion counts against particular contractors. The 31 indictees were separated into four groups for trial. The first trial took place in the spring of 1994 and was presided over by Judge Korman. Matthew Taylor, one of the founders of United Brooklyn, was convicted of two of the substantive extortion counts and the other defendants were acquitted on all charges.
 
 
 4
 In June 1994 a superseding indictment was returned against the defendants in the case now before us, who were part of the second group to go to trial.[1] Instead of charging a conspiracy among the coalitions, this indictment charged all eight defendants with conspiring with each other (that is, a conspiracy among United Brooklyn members and associates only) to affect commerce by extortion in violation of 18 U.S.C. § 1951. In addition, Nelson, Richards, Collazo and Merton Taylor were charged with carrying a firearm during and in relation to the conspiracy in violation of 18 U.S.C. § 924(c). Each defendant was also charged with at least one substantive extortion count against nine separate contractors, also in violation of 18 U.S.C. § 1951.
 
 
 5
 The trial took place in June and July of 1994. A brief sketch of the evidence at trial is useful to establish the context of the legal issues presented on appeal.
 
 
 6
 The government charged an extortion conspiracy from June 1988 to June 1993. Delroy Collins and Donald "Shakim" Collins, two leaders of United Brooklyn, and Raquel Batson, the secretary at United Brooklyn's office, testified pursuant to cooperation agreements with the government. The cooperating witnesses testified to the activities of the organization and the roles played by defendants. This testimony was corroborated and augmented by numerous recorded telephone conversations between defendants and construction contractors and members of other coalitions. A number of contractors who were the targets of United Brooklyn's activities also testified.
 
 
 7
 A primary component of United Brooklyn's operation was what was called "the shape." The shape was the group of members that showed up at United Brooklyn's office on any particular day. The shape would be taken out to construction sites by one of the leaders of United Brooklyn. Once at the site, the leader would demand that the contractor place a United Brooklyn member on the job. If the contractor refused, the shape would invade the work site and forcibly stop the work. Once a relationship with a contractor was established, the demands would escalate to encompass (1) the payment of a "coordinator's fee" to one of the leaders to prevent further work stoppages by United Brooklyn or one of the other coalitions and (2) sub-contracts for such services as demolition or security with one of a number of United Brooklyn-related companies.
 
 
 8
 In response to the government's charges, defendants relied heavily on the so-called "labor exception" to extortion under the Hobbs Act. See United States v. Enmons, 410 U.S. 396, 401, 93 S.Ct. 1007, 1010, 35 L.Ed.2d 379 (1973) (Hobbs Act "does not apply to the use of force to achieve legitimate labor ends."). Pursuant to this defense, Judge Korman instructed the jury that:
 
 
 9
 violence or threats of violence by ... those seeking employment during the course of a labor dispute is not a violation of the Hobbs Act....
 
 
 10
 [A labor dispute] can include good faith efforts to obtain jobs for minorities, from contractors or sub-contractors, who the defendants reasonably believed discriminated against minorities in hiring employees, or who the defendants reasonably believed failed to obey the law regarding the employment of minorities.[2]
 
 
 11
 To establish a basis for the labor exception, defendants introduced evidence relating to the allegedly discriminatory practices of contractors in the New York construction industry and testimony of contractors that used United Brooklyn to obtain workers without any coercion.
 
 
 12
 Defendants were convicted and principally sentenced as follows: Nelson (conspiracy; 63 months); Clarke (conspiracy, two counts of extortion; 41 months); Richards (conspiracy, one count of extortion; 51 months); Alonso (conspiracy, one count of extortion; 46 months); Collazo (conspiracy, one count of extortion; 46 months) and Taylor (conspiracy, two counts of extortion; 72 months).
 
 
 13
 On appeal, defendants' principal claim is that the district court erred in the handling of jury selection. As detailed below, both defendants and the government made objections claiming racially discriminatory use of peremptory challenges. All defendants appeal from Judge Korman's rulings on those objections. Individual defendants also raise a variety of claims specific to their own situations. Nelson and Alonso challenge evidentiary rulings with respect to certain intercepted telephone conversations. Merton Taylor claims that there was a variance between the indictment and the proof at trial, and objects to the failure to give an adequate multiple conspiracy instruction to the jury. Nelson, Alonzo and Collazo claim that the evidence against them was insufficient to support their convictions. Richards and Alonso challenge the calculation of their sentences. We analyze each claim in turn, and for convenience recount the applicable factual background in each section.
 
 Jury Selection
 A. Background
 1. The Voir Dire
 
 14
 By consent of the parties, then-Magistrate Judge Allyne Ross (the Magistrate) presided over jury selection.[3] The "struck" system of jury selection was used, whereby after potential jurors are questioned and excused for hardship or cause an initial panel of appropriate size is selected for the peremptory challenge stage of the process. See United States v. Blouin, 666 F.2d 796, 796-97 (2d Cir.1981). The initial panel selected in this case numbered 40 potential jurors, corresponding to the number of jurors in the petit jury (12), the alternate jurors (6), the peremptory challenges allotted to defendants (10 for the jury, 3 for the alternates) and those allotted to the government (6 for the jury, 3 for the alternates). Under the struck system, the first 12 jurors (in sequential order) remaining after the peremptory challenges have been either exercised or waived make up the petit jury. Striking potential jurors therefore not only removes them from the initial panel but also increases the chances that an already identified person in the panel will sit on the final jury.
 
 
 15
 Prior to the voir dire, defendants submitted a list of 13 proposed groups of questions to the Magistrate. Some questions sought specific responses about such topics as a potential juror's (1) ties to labor unions and the construction industry, (2) familiarity with minority labor coalitions and (3) possible reactions to swearing and use of racial epithets. With no opposition from the government, the Magistrate agreed to ask these questions, which comprised eight of the 13 requested groups.
 
 
 16
 Defendants characterize the remaining five groups of questions as "open-ended" ones concerning each potential juror's feelings about their community, affirmative action, the efforts of minorities to obtain jobs and the social or professional contacts that jurors had with Blacks and Latinos. The Magistrate asked four of these groups of questions, but she did so in a modified form and to the panel as a whole rather than to each juror. The Magistrate refused to ask a portion of the remaining group of questions. The Magistrate also indicated that defendants could pose individual follow-up questions in response to any juror's answers to the questions asked.
 
 
 17
 Two examples will suffice to illustrate defendants' position and the Magistrate's handling of the matter. With respect to a potential juror's community, defendants requested the following questions be asked:
 
 
 18
 Without stating your address, please name and describe the community in which you live. What are your feelings about your community? Do you feel a sense of identification or loyalty to your community? Do you belong to any community organizations or political organizations? If so, describe the organization and your role in it.
 
 
 19
 Defendants justified these questions because "[s]everal of us believe there are feelings in a neighborhood" regarding racial animus and the presence of minority residents. After the government objected, the Magistrate agreed to ask each potential juror the name of their community and if they belonged to any community or political organizations.
 
 
 20
 On the issue of affirmative action, defendants requested the following questions: "What are your feelings about affirmative action with regard to minority hiring? Have you or any member of your family had any personal experiences that affect your views on this subject?" The Magistrate declined to ask these questions, but did ask the following to the panel as a whole: "Do any of you have any views or have you had any experiences relating to minority hiring or affirmative action that you think might cause you to lean in some way, in any way, if you sit as a juror in this case?" When defendants objected that this question was asked "in a vacuum" and elicited no immediate response from any of the potential jurors, the Magistrate agreed to rephrase the question. She then asked: "Do any of you have very strong views of minority hiring [or] affirmative action?"
 
 
 21
 2. Peremptory Challenges and the Magistrate's Decision
 
 
 22
 Following the questioning of the panel and a number of dismissals for hardship or cause,[4] the parties began to exercise their peremptory challenges. Defendants used their first eight challenges to remove White jurors, and the government objected pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), claiming that the challenges were made on the basis of race. Defendants responded by objecting to the government's use of two of their first three peremptories to strike Latino jurors. The Magistrate then heard oral argument during which defendants and the government placed on the record their reasons for each of the disputed challenges. The proceeding was adjourned and the parties were invited to make written submissions.
 
 
 23
 A few days later the Magistrate, in a thorough decision delivered from the bench, invalidated two of defendants' challenges, sustained their other six challenges and sustained the government's two challenges.
 
 
 24
 The Magistrate first rejected defendants' arguments that Batson did not apply to them given the circumstances of this jury selection. The Magistrate rejected the view (advanced by Richards) that Batson does not apply to race-based challenges of Whites made by minority defendants for the purpose of (1) assuring adequate minority representation on the jury, or (2) avoiding racist jurors and ensuring that jurors have experienced or witnessed discrimination. She also rejected the argument (advanced by Clarke) that Batson did not apply in this case because the court refused to ask the open-ended questions about race and racial attitudes requested by defendants, thereby forcing them to rely on such a concededly inadequate measure of racial attitudes as the community in which the potential juror lived.
 
 
 25
 The Magistrate then found that the government had made out a prima facie case that defendants' challenges were based upon race. This determination was based on a number of factors. First, defendants had challenged no minority jurors, although minorities made up approximately one-third of the panel. Second, the Magistrate recognized a similarity between jury selection here and the pattern of peremptory challenges in the first trial in which those defendants "exercised all or virtually all of their peremptory challenges to eliminate whites from the jury panel." Third, defendants had exhibited "apparent race consciousness in taking positions in connection with hardship excuses" in that defendants were willing to let White jurors be excused for almost any reason but fought hard to deny hardship excuses to minority jurors. Finally, the Magistrate stated that this was a "case about race" and "allegations of racial discrimination are at the heart of the defense." This last factor could therefore "provide motivation to select a jury with the greatest number of persons whose race was the same as that of the defendants."
 
 
 26
 After noting that defendants had offered facially-sufficient race-neutral reasons for each challenge, the Magistrate determined that the government had nonetheless "met its burden of proving that defendants exercised their peremptory challenges, at least in part, guided by race-based considerations." She was persuaded that "it was a defense strategy in jury selection in this case to exercise the maximum number of peremptories to eliminate white jurors, thus maximizing the number of blacks and hispanics on the petit jury." In addition to the factors set forth above, the Magistrate gave other reasons for this determination. She offered numerous specific examples of race-neutral reasons proffered by defendants that (1) could not be satisfactorily explained or "were evidently make-weight," (2) "made no sense" or (3) were not applied equally to minorities (in other words, minority jurors were not challenged even though they exhibited the same negative characteristic(s) on which defendants claimed to have based their challenges to White jurors).
 
 
 27
 The Magistrate then determined that it was appropriate for her to engage in the "dual motivation" analysis approved by this court in Howard v. Senkowski, 986 F.2d 24 (2d Cir.1993). Under that analysis, when racial considerations are conceded or have been determined to be a substantial factor in exercising peremptory challenges, the burden shifts to the proponent of the challenge (in this instance, defendants) to show that "the same challenges would have been exercised for race-neutral reasons." Id. at 30.
 
 
 28
 Applying this analysis to each of the jurors challenged by defendants, the Magistrate found that two jurors--jurors 3 and 4--would not have been challenged in the absence of racial considerations. With respect to the other six jurors challenged by defendants--jurors 14, 15, 16, 18, 21 and 26--the Magistrate found that these jurors would still have been challenged even absent any racial motivation. She therefore invalidated defendants' challenges to jurors 3 and 4, but allowed their challenges to the other six jurors to stand. She also restored two challenges to defendants.
 
 
 29
 Turning to defendants' attack on the government's challenges--to Latino jurors 8 and 17--the Magistrate stated "I am highly doubtful on this record that defendants have established a prima facie case of race-based challenges." However, since the government had offered to explain its challenges, she went on to analyze the explanations. With respect to juror 17, she determined that the government's strike "was clearly warranted by the record" because of that juror's first-hand experience with minority labor coalitions and evidence that he identified with the coalitions. She next noted that the challenge to juror 8 "presents greater difficulties." The government indicated that the reasons it had challenged juror 8 were that (1) her accent showed that English was not her first language and she might not understand the trial testimony or make herself understood in jury deliberations and (2) she might be unable to accept the official translation of the tape-recorded conversations offered into evidence that were in Spanish. The Magistrate found both reasons to be unpersuasive but nevertheless sustained the challenge. She viewed "the record as barren of evidence that the government exercised its peremptory challenges in a discriminatory manner," so that "the government's proffer of what I view as a weak reason for challenging juror number 8 [does not] suffice[ ] to establish by a preponderance of the evidence that the government's challenge was therefore race-based."
 
 3. The Review by Judge Korman
 
 30
 Defendants appealed to Judge Korman, objecting to the reinstatement of White jurors 3 and 4 and to the Magistrate's decision to sustain the government's challenges to Latino jurors 8 and 17. The government also appealed, objecting to the Magistrate's refusal to invalidate defendants' challenges to White jurors 14, 15, 16, 18, 21 and 26. Judge Korman asked both defense counsel and the government to submit affidavits stating whether race was a factor in the determination to strike each juror. In response to this request, defense counsel jointly affirmed on the record the truth of the following statement: "For every juror who was excluded, there were a number of factors. For some jurors, race is a factor. In no juror was race the sole factor."
 
 
 31
 Judge Korman issued an oral ruling from the bench. He affirmed the Magistrate's decision that Batson applied to defendants in this jury selection. He then found that "the record clearly supports" the Magistrate's finding that the government had met its burden of proving that defendants' challenges were racially motivated. Turning to the Magistrate's handling of the dual motivation analysis, he affirmed her decision to (1) invalidate defendants' challenges to jurors 3 and 4 and (2) sustain defendants' challenges to jurors 14 and 18. However, he reversed the Magistrate's decision that defendants would have challenged jurors 15, 16, 21 and 26 in the absence of racial considerations. Finally, the Judge affirmed the Magistrate's decision to sustain the government's challenges to jurors 8 and 17, characterizing defendants' appeal of that decision as "frivolous." Jurors 15, 16, 21 and 26 were reinstated to the panel and four peremptory challenges were returned to defendants.
 
 
 32
 After the trial, Judge Korman issued a Memorandum "to elaborate upon the basis for the part of my [oral] ruling which ... reversed the holding of [the Magistrate] that the defendants had properly excluded four jurors." He noted at the outset that his review was de novo, and he apparently based his decision on (1) the transcripts of the voir dire and oral argument on the Batson objections before the Magistrate, (2) the proceedings in front of him on issues related to the appeal of the Magistrate's decision, (3) the written submissions of the parties made to the Magistrate and (4) the affirmation of defendants' counsel (made before the judge) on the role of race in their challenges.
 
 
 33
 Stating that this was one of the "rare cases in which the defendants conceded, and the [Magistrate] independently found" that they exercised their peremptory challenges based in part on racial considerations, defendants' challenges could still stand if they could show that it was "more likely than not that the same challenge[s] would have been made if race was not a factor." As part of this burden the judge required defendants to explain why "a reasonable person would regard a juror possessing [the proffered] race-neutral characteristic as undesirable for [this] particular case."
 
 
 34
 The judge then addressed defendants' challenges to jurors 15, 16, 21 and 26 and determined that defendants had not met their burden. For reasons stated later in this opinion, the decision with respect to juror 16 is the only one relevant to this appeal.
 
 
 35
 Judge Korman found that race was the dominant factor in challenging juror 16. In sustaining defendants' challenge, the Magistrate had found:
 
 
 36
 [Juror 16] acknowledged that she had not been a member of the work force for 'ages and ages,' and defense counsel had advanced a reasonable and, I believe, forceful argument that because of the nature of the defense in this case, defendants sought jurors who had been in the work place, and had been exposed to a broad array of opinions and experiences.
 
 
 37
 Judge Korman came to a different conclusion, stating:
 
 
 38
 The principal error [the Magistrate] made in sustaining the defendants' objection to Juror was that she confused a race-neutral explanation with the kind of evidence that must be produced by a party whose challenges are concededly racially motivated.... [While the Magistrate] accepted the defendants' argument that they "sought jurors who had been in the workplace, and [who] had been exposed to a broad array of opinions and experiences," neither the defendants or [the Magistrate] explained why such a juror would be either more or less desirable in this case.
 
 
 39
 Concluding that "the defendants failed to establish that race was not the dominant factor that led the defendants to strike this juror," the judge invalidated the challenge.
 
 
 40
 4. The Continuation of Peremptory Challenges and Further Batson Objections
 
 
 41
 Jury selection continued immediately after Judge Korman made his oral ruling. Defendants requested that the six reinstated jurors (two by the Magistrate and four by Judge Korman) be asked additional questions about their neighborhoods and about racial issues. The Magistrate refused to pose these additional questions. Defendants then struck three more White jurors--jurors 5, 10 and 13--and the government made Batson objections. The Magistrate rejected defendants' argument that the reason they struck these three jurors was that they had nothing in particular to recommend them, and by challenging them they increased their chances of getting three other (and preferable) panel members, two of whom were White, on the final jury. Given the reasons proffered by defendants for each juror, the Magistrate sustained the strike of juror 5, but invalidated the challenges to jurors 10 and 13.
 
 
 42
 Defendants again appealed to Judge Korman, this time complaining of the Magistrate's invalidation of the latter two strikes. The judge refused to rule on the question until all of the challenges were exercised or waived, at which point both sides challenged two more jurors each. After a confusing oral argument, Judge Korman overruled the Magistrate's decision to invalidate the challenges of jurors 10 and 13. He found that these challenges were "less suspect" since as a result of the challenges, two White jurors would be added to the panel and the overall racial composition of the jury would not change.
 
 
 43
 Thus, this extended jury selection was brought to a close. At the beginning of the trial, the petit jury consisted of two jurors challenged by the defense and reinstated by the Magistrate (jurors 3 and 4)[5] and three jurors challenged by the defense and reinstated by Judge Korman (jurors 15, 16 and 21).[6] There were seven Whites, four Blacks and one Latino.B. Discussion
 
 1. The Adequacy of the Voir Dire
 
 44
 Defendants argue that the voir dire in this "racially-charged" case was "grossly inadequate" to expose possible racial bias and prejudice of potential jurors. They claim that a new trial is warranted because this inadequacy was "per se" reversible error as it violated their Sixth Amendment right to a trial before an impartial jury.
 
 
 45
 "Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire." Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). The Supreme Court has addressed the constitutional standards applicable in assessing a claim that issues of racial prejudice were not adequately explored in the voir dire. See id. at 189-90, 101 S.Ct. at 1634-35. In Mu'Min v. Virginia, 500 U.S. 415, 424, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991), the Court noted:
 
 
 46
 [T]wo parallel themes emerge from [these] cases: First, the possibility of racial prejudice against a black defendant charged with a violent crime against a white person is sufficiently real that the Fourteenth Amendment requires that inquiry be made into racial prejudice; second, the trial court retains great latitude in deciding what questions should be asked on voir dire.
 
 
 47
 In Aldridge v. United States, 283 U.S. 308, 311, 51 S.Ct. 470, 472, 75 L.Ed. 1054 (1931), the Court held that it was reversible error for the trial court to have "failed to ask any question which could be deemed to cover the subject" of racial prejudice when such a question was requested by a Black defendant charged with a violent crime against a White victim.
 
 
 48
 This case involves Black and Latino defendants charged with crimes against mostly White construction contractors. To probe issues of racial prejudice, the Magistrate, as already indicated, asked a number of questions based upon the list submitted by defendants. She declined to ask so-called "open-ended" questions to each juror but, in the proper exercise of her ample discretion in conducting the voir dire, asked a number of questions to the panel as a whole that "cover[ed] the subject." See United States v. Barnes, 604 F.2d 121, 137 (2d Cir.1979) ("at least some questioning [is required] with respect to any material issue that may arise, actually or potentially, in the trial"), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Ten jurors were excused for cause in response to the Magistrate's questions. She also agreed to allow defendants to ask individual questions as a follow-up to responses that her general questions elicited.
 
 
 49
 Even if the questions that the Magistrate asked were "inadequate" in the sense that they did not provide defendants with as much information as they would have liked about the racial attitudes and experiences of potential jurors, that does not mean that the questions were "inadequate" in the sense that any constitutional right was violated. The Supreme Court in Mu'Min clearly rejected such an argument with respect to potential juror bias from pretrial publicity:
 
 
 50
 Undoubtedly, if counsel were allowed to see individual jurors answer questions about exactly what they had read [about the case], a better sense of the juror's general outlook on life might be revealed, and such a revelation would be of some use in exercising peremptory challenges. But, since peremptory challenges are not required by the Constitution, Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273 [2278], 101 L.Ed.2d 80 (1988), this benefit cannot be a basis for making "content" questions about pretrial publicity a constitutional requirement.
 
 
 51
 500 U.S. at 424-25, 111 S.Ct. at 1905. We see no reason not to adopt the same reasoning in this case. We do not minimize the importance to criminal defendants of removing the possibility of racial bias on the jury. How best to do that, however, is primarily left to the broad discretion of the district court.
 
 
 52
 Furthermore, it was not an abuse of discretion for the Magistrate to refuse to re-open the voir dire for more questions after Judge Korman ruled on the first set of peremptory challenges. Defendants had no greater right to have their questions asked at that point than they did during the original voir dire. In sum, there was no violation of defendants' constitutional right to an impartial jury.
 
 2. The Scope of Review by This Court
 
 53
 Two of the jurors reinstated by Judge Korman--jurors 15 and 21--were excused during the trial and were replaced by alternates before deliberations commenced. As already noted in the margin, a third reinstated juror--juror 26--never sat on the petit jury. Thus, only one of the jurors reinstated by Judge Korman--juror 16--sat on the deliberating jury.
 
 
 54
 The government seeks to limit the scope of our review to Judge Korman's reinstatement of juror 16, arguing with respect to defendants' challenges to jurors 15, 21 and 26 that "[w]here ... the denial of a challenge had no effect whatever, neither causing a juror to sit nor depleting a party's supply of peremptory challenges, there has been no impairment of the right to exercise peremptory challenges." Defendants respond that the denial of their challenges had an effect on the ultimate composition of the jury, even if the particular jurors challenged did not sit, because "defense counsel's entire jury selection strategy and the pool of available jurors against whom challenges could be exercised was completely altered by the court's decision."
 
 
 55
 Defendants correctly assert that if their right to exercise peremptory challenges has been denied or impaired, they need not show that the jury was biased in order to obtain a new trial. See Carr v. Watts, 597 F.2d 830, 833 (2d Cir.1979); Kirk v. Raymark Industries, Inc., 61 F.3d 147, 158-62 (3d Cir.1995). However, defendants must show some denial or impairment of the right to exercise peremptory challenges.[7]
 
 
 56
 Even assuming that Judge Korman improperly reinstated jurors 15, 21 and 26, we cannot say that there has been an impairment of the right to exercise peremptory challenges where a defendant has been improperly precluded from challenging a juror, but that juror does not sit on the deliberating jury and the defendant has had the opportunity to exercise all of the allotted challenges. There is no impairment simply because a defendant's jury selection strategy is "altered." Cf. United States v. Blouin, 666 F.2d at 798-99 (no impairment of right where party simply shows that under a different jury selection procedure, he could have made more effective use of peremptories); United States v. Keegan, 141 F.2d 248, 254-55 (2d Cir.1944), rev'd on other grounds, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745 (1945) (party must be given opportunity to use all allotted challenges, not the opportunity to use them at a particular time). With regard to the jurors reinstated by Judge Korman, we therefore limit our review to the decision to invalidate defendants' challenge to juror 16.
 
 
 57
 3. Appellate Review of Judge Korman's Decision
 
 
 58
 (a) The Standard of Review
 
 
 59
 Defendants argue that we should reverse Judge Korman's decision because it did not accord suitable deference to the Magistrate's determination that race was not the primary factor in challenging juror 16. The Magistrate's determination was based on the credibility of defendants' proffered race-neutral explanations. This general argument encompasses a series of related points. First, defendants claim that Judge Korman should not have made a de novo determination of the Magistrate's decision based solely on the "cold record" without "hearing testimony and viewing witnesses." Second, without taking further testimony, the judge should not have substituted his own credibility findings for those of the Magistrate, who conducted the voir dire and heard defendants' arguments. Third, because Judge Korman made the two errors just mentioned, this court should conduct a de novo review of his decision.
 
 
 60
 We look first to the standard of review to be applied on appeal of a district court's Batson ruling. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991). For this reason the Supreme Court has determined that the ultimate question of discriminatory intent represents a finding of fact that will be set aside only if clearly erroneous. Id. at 364, 369, 111 S.Ct. at 1868, 1871; see also Batson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21 ("a reviewing court ordinarily should give [a finding of intentional discrimination] great deference") (citing Anderson v. Bessemer City, 470 U.S. 564, 575-76, 105 S.Ct. 1504, 1512-13, 84 L.Ed.2d 518 (1985)). In United States v. Alvarado, 951 F.2d 22 (2d Cir.1991), we stated, in review of a prosecutor's peremptory challenges made before a magistrate, "the task of assessing the prosecutor's explanations, in order to determine the ultimate issue of whether discrimination has been shown, falls primarily upon the judicial officer conducting the jury selection, whose determinations as to credibility of the proffered explanations are entitled to appropriate deference." Id. at 25 (quotation omitted).
 
 
 61
 In most cases this standard of review presents no great difficulty. If the judicial officer presiding over jury selection is the district judge, or as in Alvarado, if the judicial officer is a magistrate and the district judge approves the magistrate's findings, we are to accord substantial deference to the decision below and reverse only if that decision was clearly erroneous. This case is different. Here, the district judge reversed part of the Magistrate's decision, conducting a de novo review and making his own findings based in part on his review of the written record.
 
 
 62
 The resolution of this problem requires first, an examination of the proper procedure by which the district judge should review a magistrate's jury selection decisions and second, the resolution of any tension between that procedure and the concern, present in appellate review of Batson challenges, that deference be accorded to the presiding judicial officer.
 
 
 63
 In Peretz v. United States, 501 U.S. 923, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991), the Supreme Court held that under 28 U.S.C. § 636(b)(3), a magistrate can supervise jury selection in a criminal felony trial with the consent of the parties. In order to meet the constitutional requirements of Article III, however, de novo review by the district judge of the magistrate's jury selection decisions must be available if requested by one of the parties. Id. at 939, 111 S.Ct. at 2670. The Court went on to indicate that how the de novo review was to be conducted depended on the circumstances of the case:
 
 
 64
 Although there may be other cases in which de novo review by the district court would provide an inadequate substitute for the Article III judge's actual supervision of the voir dire, the same is true of a magistrate's determination in a suppression hearing, which often turns on the credibility of witnesses. We presume, as we did in Raddatz when we upheld the provision allowing reference to a magistrate of suppression motions, that district judges will handle such cases properly if and when they arise. See [Raddatz, 447 U.S.] at 681, n. 7 [100 S.Ct. at 2415 n. 7].
 
 
 65
 Peretz, 501 U.S. at 939, 111 S.Ct. at 2671 (citation omitted).
 
 
 66
 In United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), the Supreme Court had addressed the situation where the district court reviews de novo a magistrate's determination that involved credibility findings. The Court held that under 28 U.S.C. § 636(b)(1), a new hearing by the district judge on contested credibility findings by a magistrate in a suppression hearing was not required. Id. at 676, 100 S.Ct. at 2412. That decision was left to the district judge's discretion. Id. "While the district court judge alone acts as the ultimate decisionmaker, the statute grants the judge the broad discretion to accept, reject, or modify the magistrate's proposed findings. That broad discretion includes hearing the witnesses live to resolve conflicting credibility claims." Id. at 680, 100 S.Ct. at 2415. The Court went on to say in a footnote that:
 
 
 67
 Neither the statute nor its legislative history reveals any specific consideration of the situation where a district judge after reviewing the record in the process of making a de novo "determination" has doubts concerning the credibility findings of the magistrate. The issue is not before us, but we assume it is unlikely that a district judge would reject a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach.
 
 
 68
 Id. at 681, n. 7, 100 S.Ct. at 2415, n. 7 (emphasis in original). The Court's later citation in Peretz to this footnote in Raddatz leads us to believe that similar considerations would apply to the review of a magistrate's dispositive credibility findings with respect to jury selection decisions.
 
 
 69
 This court has addressed the question left open by the footnote in Raddatz. In United States v. Rosa, 11 F.3d 315 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994), in the context of credibility findings made in a suppression hearing, we rejected the argument that a "district court could not properly reject the magistrate judge's recommendation without hearing live testimony from all the witnesses who testified before the magistrate judge." Id. at 328. In such a case, a court "need hear testimony from only the witnesses whose credibility is in question." Id. at 329 (citing Grassia v. Scully, 892 F.2d 16, 20 (2d Cir.1989)). The propriety of a district judge's rejection of a magistrate's credibility findings has apparently not arisen in this court in the context of jury selection.
 
 
 70
 The question in this case is what procedure must the district court follow before reversing a magistrate's credibility finding on the decisive question in the dual motivation analysis of whether counsel would have exercised a peremptory challenge in the absence of racial considerations.
 
 
 71
 We hold that as long as the district judge has afforded an opportunity to be heard to the party whose credibility is in question--in this context the proponent of the peremptory challenge--the district judge's determination will be accorded substantial deference and will not be overturned unless clearly erroneous. We think that this standard comports with both the constitutional requirement that an Article III judge make a de novo determination of contested jury selection decisions by the magistrate and the expectations of the parties when they have consented to have a magistrate preside over jury selection.
 
 
 72
 Judge Korman accepted the Magistrate's finding that all of the defendants' peremptory challenges were based, at least in part, on race. He agreed that dual motivation analysis was appropriate. Where he differed with the Magistrate was in her determination that, with respect to juror 16, defendants had met their burden of proving that this juror would have been challenged had race not been a factor. The Magistrate accepted defendants' offered reason--juror 16 had long been out of the workplace and had not been exposed to a broad range of opinions--as the primary motivation for their challenge. Judge Korman, however, rejected the reason because neither defendants nor Judge Ross "explained why such a juror would be either more or less desirable in this case."
 
 
 73
 Judge Korman did not have the juror before him and did not observe the voir dire. He did, however, have defense counsel before him on a number of issues related to the objections to the peremptory challenges, including (1) whether Batson applied to defendants under the circumstances; (2) the use of a juror's neighborhood as the basis for a challenge; and (3) the adequacy of the voir dire. He also observed the affirmation of defendants' counsel, placed on the record before him, that race had been a factor in at least some of their challenges. While these circumstances may not have been optimal, we find that this was a sufficient procedure. Therefore, we will reverse Judge Korman's decision only if it was clearly erroneous.
 
 
 74
 (b) Defendants' Other Arguments
 
 
 75
 Defendants offer a number of other reasons why we should reverse Judge Korman's decision.
 
 
 76
 Defendants claim that their affirmation that "[f]or some jurors race is a factor" was not a concession that race was a factor in each and every one of their peremptory challenges. Therefore, their argument continues, Judge Korman should not have applied a dual motivation analysis when he disallowed defendants' challenge to juror 16. We do not agree. As stated in Howard v. Senkowski, dual motivation analysis is appropriate in those cases where the opponents of a challenge "can show that racial discrimination was a substantial part of the motivation" for the challenge, that is, they have met their burden under Batson. 986 F.2d at 30. Judge Korman stated in his Memorandum that defendants had conceded that race was a factor in their challenges. That statement was correct as applied to the challenges as a whole. The judge also relied on the Magistrate's finding that "defendants' eight peremptory strikes of white jurors were motivated at least in part by race." Under the circumstances, dual motivation analysis was appropriate.
 
 
 77
 Defendants also question the continued validity of Howard following the Supreme Court's opinion in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). In defendants' words, "[t]he court [in Purkett ] emphasized that in a Batson analysis 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' Id. [at ----, 115 S.Ct.] at 1771, emphasis added." Defendants apparently argue that in this case both the Magistrate and Judge Korman improperly shifted the burden to them. However, the dual motivation analysis shifts the burden to the proponent of the strike after the opponent of the strike, in this case the government, has met its "ultimate burden of persuasion regarding racial motivation." See Price Waterhouse v. Hopkins, 490 U.S. 228, 244-45, 109 S.Ct. 1775, 1787-88, 104 L.Ed.2d 268 (1989) (after plaintiff has proved discriminatory motive in Title VII case, defendant bears burden of proof on dual motivation issue); Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (after plaintiff has proved improper First Amendment motive, defendant bears burden of proof on dual motivation issue).
 
 
 78
 Defendants also argue that Judge Korman required them to present reasons in support of their challenge to juror 16 that rose to the level of a challenge for cause. Judge Korman stated that once "the record compellingly supports the conclusion that race impermissibly motivated" a particular challenge by defendants, they had to explain the manner in which the race-neutral characteristic is " 'related to the particular case to be tried'... i.e., why a reasonable person would regard a juror possessing that race-neutral characteristic as undesirable for that particular case." The phrase "related to the particular case to be tried" comes directly from Batson. 476 U.S. at 98, 106 S.Ct. at 1723. Although there may be some dispute as to the meaning of that language given the recent Supreme Court opinion in Purkett v. Elem, supra, that case dealt only with the burden on the proponent of a challenge to a juror to produce a race-neutral reason for it. See 514 U.S. 765, ----, 115 S.Ct. 1769, 1772, 131 L.Ed.2d 834 (Stevens, J., dissenting). Here, Judge Korman found that the government had shown that race motivated defendants' challenges. Nevertheless, he allowed defendants the opportunity to prevail if they could show that they would have challenged a particular juror even if race had not been a factor. In order to meet their burden on this phase of the analysis, defendants were required to offer reasons for challenging that had some relationship to the case. It is appropriate to require such a relationship in determining that a challenge would have been made in the absence of racial considerations. Moreover, such a requirement is not the same as requiring a challenge to be for cause.
 
 
 79
 Defendants also argue that is was improper for both the Magistrate and Judge Korman to rely on what took place in jury selection at the first trial in ruling on the Batson objections to defendants' peremptory challenges in the second trial. Defendants claim that it is unfair to hold them responsible for the actions of the first group of defendants. They also note that, since the government made no Batson objection in the first trial, there was no finding that the peremptory challenges there were based on racial considerations.
 
 
 80
 Defendants' characterization of this factor as "a paramount consideration behind the decisions below" is incorrect. The Magistrate looked at the pattern of peremptory challenges used by the defendants in the first trial--during the jury selection that she presided over--as only one factor in assessing whether a prima facie case of purposeful discrimination had been made out in the second trial. She relied on a number of other factors as well, and to that extent any reliance on the events of the first trial was unnecessary.
 
 
 81
 Judge Korman also mentioned the events of the first trial both in his oral ruling and his written Memorandum. He recounted, in some detail, the evidence presented at the first trial and characterized the defendants there as making a "blatant appeal to race" and held them responsible for the "demagoguery that pervaded the first trial." Because the petit jury in the first trial was approximately 80% Black and Latino, and that trial resulted in acquittals for most of the defendants there, Judge Korman stated that "[c]ounsel here likely perceived the outcome of the first trial as vindicating their strategy of striking white jurors so as to maximize minority representation."
 
 
 82
 Judge Korman referred to the first trial in two other instances. First, in stating his agreement with the Magistrate that the record supported her assessment that defendants were inconsistent in their treatment of requests for hardship excuses based on the race of the juror making the request, he referred to a similar episode in the first trial. However, the record in the jury selection process in the second trial alone clearly supports the Magistrate's decision.
 
 
 83
 Second, Judge Korman also considered events during jury selection in the first trial in his decision to reverse the Magistrate and hold that race was the only factor in defendants' decision to strike juror 16. However, Judge Korman was careful to state elsewhere that "the defendants here are not 'estopped' by the manner in which counsel in the earlier case chose to exercise their challenges."
 
 
 84
 In sum, although the concept of looking at events in the first trial in judging challenges in the second trial is troubling at first blush, we cannot say that here it was reversible error. In view of the record in the second trial alone, we cannot say that these references had any prejudicial effect. In essence, Judge Korman agreed with the Magistrate's decision that the government had met its burden, on the record of the second trial, to prove that defendants' challenges were based on race, given all of the factors that she relied on.
 
 
 85
 Finally, defendant Richards explicitly argues to us that the race of a potential juror can legitimately be used to evaluate a juror when the defense requires proof of racial discrimination. We do not agree. Race cannot be used as a proxy for other considerations, e.g., experience of the potential juror, in exercising peremptory challenges. See Batson, 476 U.S. at 97-98, 106 S.Ct. at 1723 ("The core guarantee of equal protection ... would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions [ ] which arise solely from the jurors' race."); cf. J.E.B. v. Alabama, 511 U.S. 127, ----, 114 S.Ct. 1419, 1429, 128 L.Ed.2d 89 (1994) ("gender simply may not serve as a proxy for bias" in support of a peremptory challenge). This rule of law does not fluctuate according to the nature of the case at trial or the amount of information that the defense counsel or the prosecutor has regarding potential jurors as a result of the voir dire. Defendants may be correct as a matter of fact that a White juror has probably never experienced the kind of discrimination that defendants allege exists against minorities in the New York construction industry. Be that as it may, in the exercise of peremptory challenges, a White juror's race--just like a Black juror's race--"is irrelevant as a matter of constitutional law." See J.E.B., 511 U.S. at ----, 114 S.Ct. at 1432 (O'Connor, J., concurring) (emphasis supplied).
 
 
 86
 In conclusion, we find that Judge Korman's decision to reverse the Magistrate with regard to juror 16 was not clearly erroneous.
 
 
 87
 (c) The Government's Peremptory Challenges
 
 
 88
 Judge Korman accepted without comment the Magistrate's finding that the government had not based its challenges to jurors 8 and 17 on race and her decision to sustain those challenges. As we have already noted, in such a situation we accord substantial deference to the decision below and will reverse that decision only if clearly erroneous.
 
 
 89
 Turning first to juror 17, defendants make no significant argument that sustaining the strike was clearly erroneous.
 
 
 90
 With regard to juror 8, defendants argue primarily that the Magistrate should not have sustained the challenge to that juror when she rejected the government's proffered reasons--her potential inability to understand testimony and make herself understood in the jury room or accept the official translation of taped conversations in Spanish. In her review of the government's challenge the Magistrate followed the procedure outlined in Batson and its progeny. Defendants had the burden of proving the racial motivation for the government's challenge. The Supreme Court in Purkett specifically admonished courts not to collapse the second portion of the Batson test (the production by the proponent of the challenge of a facially race-neutral reason for the strike) with the third part of the test (the determination that the opponent of the challenge has shown that the strike was made on the basis of race). See Purkett, 514 U.S. at ----, 115 S.Ct. at 1771. The Magistrate's decision avoided this precise mistake.
 
 
 91
 The Magistrate found the government's reasons to be facially sufficient, see Hernandez, 500 U.S. at 361, 111 S.Ct. at 1867, and although she apparently rejected one of the reasons and regarded the other as "not ... persuasive," she nevertheless found "the record ... barren of evidence that the government exercised its peremptory challenges in a discriminatory manner." She therefore viewed the issue as "whether the government's proffer of ... a weak reason for [the challenge] suffices to establish by a preponderance of the evidence that the government's challenge was therefore race-based." The Magistrate answered the question in the negative and Judge Korman accepted that determination. We cannot say that this was error.
 
 
 92
 Defendants also argue that because the government admitted that ethnicity was a factor in its decision to challenge juror 8, the court should have applied the dual motivation analysis to this challenge. In response to Judge Korman's request to declare if race was a factor in making its challenges, the government submitted an affidavit that stated:
 
 
 93
 Because [Juror 8's] accent is Hispanic, it cannot be honestly said that her ethnicity played no factor in our decision to strike her. It is our position, however, that we would have exercised a challenge to a white person with an equally heavy accent.
 
 
 94
 The government's statement was based on the accent of juror 8 in that it revealed that Spanish was her first language, or put another way, that English was not her first language. The Supreme Court in Hernandez stated that although criteria based on language ability "might well result in the disproportionate removal of prospective Latino jurors, that disproportionate impact does not turn the prosecutor's actions into a per se violation of the Equal Protection Clause." 500 U.S. at 361, 111 S.Ct. at 1867. The government's statement was not enough, in the absence of a finding by the Magistrate that the challenge was based on race--as she made with respect to defendants' challenges--to trigger the application of the dual motivation analysis.
 
 Trial and Sentencing
 A. Evidentiary Rulings
 1. Darren Nelson
 
 95
 At trial Nelson sought to have admitted into evidence a recorded conversation between himself and a moving contractor concerning moving jobs for United Brooklyn members. This conversation also touched on issues of racial harmony, with the contractor saying "[w]e gonna make a change for [our] kids," for "your son, and my son." Nelson conceded that the other party to the conversation was not in the construction industry.
 
 
 96
 Judge Korman excluded the conversation, stating that "In my view it's of the remotest relevance, if it's relevant at all. It's cumulative and I exclude it." The judge elaborated further after Nelson submitted a letter to him arguing again for its admission:
 
 
 97
 We don't even know from this tape or from any competent testimony who we're dealing with. From what you've told me, this is not an incident involving anyone in the building trades. It's of remotest relevance.... [G]ood acts are not admissible to show that he didn't commit bad acts. They're basically not relevant....
 
 
 98
 Nelson argues that the tape was relevant to his defense because it was offered to show that his conduct fell within the labor exception to the Hobbs Act and its exclusion deprived him of a fair opportunity to present this defense. He also argues that the evidence undercut the government's assertion that the activities of United Brooklyn were not, as defendants claimed, directed at civil rights and minority employment opportunities, but were "a con and a fraud."
 
 
 99
 The labor exception to the Hobbs Act only applied in this case to efforts to obtain jobs from contractors who defendants reasonably believed were discriminating against minorities in violation of law. These contractors were all involved in construction projects in New York City. The conversation at issue touched on racial tension only briefly and related to obtaining jobs from someone concededly not in the construction industry.
 
 
 100
 Moreover, excluding the tape did not deprive Nelson of a fair opportunity to present his defense. Defendants offered extensive testimony on racist practices in the construction industry. Nelson offered testimony specific to his own activities in attempting to secure jobs for the members of United Brooklyn. The excluded conversation was neither "critical to [Nelson's] defense," United States v. McBride, 786 F.2d 45, 50 (2d Cir.1986), nor would it have had "a substantial effect on the jury's verdict," United States v. Onumonu, 967 F.2d 782, 789 (2d Cir.1992). Under the circumstances, we cannot say that the district court abused its discretion in excluding the tape. See United States v. Caming, 968 F.2d 232, 238 (2d Cir.), cert. denied, 506 U.S. 956, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992).
 
 2. Angel Alonso
 
 101
 The government offered into evidence a recording of a telephone conversation between Alonso and his wife in which the government contends Alonso stated that he was carrying a gun on the shape and had subsequently stored it in the offices of United Brooklyn. Alonso objected that the tape was inadmissible as a privileged marital communication. Judge Korman recognized that there was "no question that the whole thing would be subject to the spousal privilege if it were a private conversation with no one else in the room.... The question is whether there was anybody else there."
 
 
 102
 The judge held a hearing on this issue. Alonso testified that the conversation took place in the office of a company affiliated with United Brooklyn, but that with one brief exception during an irrelevant part of the conversation no one else was present. After listening to the tape numerous times the judge denied the motion to suppress it, stating that Alonso had not "met [his] burden of showing there were no outsiders present." Judge Korman refused to credit Alonso's testimony that no one else was in the room. The judge based his decision on evidence from the tape, including an aside that appeared to be directed at someone else who was within the range of a normal speaking voice, that other people were present.
 
 
 103
 The judge correctly noted that knowledge of the presence of a third party defeats the application of the spousal privilege. See Pereira v. United States, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954); In Re Witness Before the Grand Jury, 791 F.2d 234, 239 (2d Cir.1986). However, Alonso argues to us that Judge Korman improperly placed on him rather than on the government the burden of proving that no one else was present during the conversation. Conversations between spouses are presumed confidential, and Alonso is correct that in this case the government bore the burden of defeating this presumption by showing that the communication was not made privately. In Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951), the Supreme Court stated: "[T]he Government insists that [the party claiming the privilege] should be denied the benefit of the privilege because he failed to prove that the information was privately conveyed. This contention ignores the rule that marital communications are presumptively confidential. The Government made no effort to overcome the presumption." Id. at 333, 71 S.Ct. at 302 (citation omitted).
 
 
 104
 While Judge Korman incorrectly stated that Alonso had the burden of proving there were no outsiders present, the government did offer evidence rebutting the presumption of confidentiality. The judge considered all of the evidence offered by both sides, and it is clear from the record that (1) the government rebutted Alonso's testimony that he was alone during the conversation and, even more significantly, (2) the judge did not believe Alonso's testimony. Therefore, the tape was correctly admitted into evidence. We note that even if it should have been excluded, the error was harmless because the tape was primarily relevant to the firearms charge, on which Alonso was acquitted. See Fed.R.Crim.P. 52(a) ("[a]ny error ... which does not affect substantial rights shall be disregarded").
 
 B. Multiple Conspiracies
 
 105
 Merton Taylor argues that there was a variance between the single conspiracy to commit extortion charged against him and the proof at trial, which established multiple conspiracies. He further argues that he was substantially prejudiced by this variance between the indictment and the proof. In support of the alleged variance, Taylor points to testimony at trial regarding the activities of a number of other minority labor coalitions operating in New York City during the period of the charged conspiracy. He claims that this testimony proved the existence of a number of different conspiracies, and that no evidence was offered linking him to these other conspiracies.
 
 
 106
 In response to a claim of variance, we first determine "whether the government sufficiently proved the conspiracy alleged in the indictment, and that the defendant was a member of that conspiracy." United States v. Johansen, 56 F.3d 347, 350 (2d Cir.1995).
 
 
 107
 The superseding indictment charged a conspiracy among the leaders of United Brooklyn to extort money and property from construction contractors through threats of force and violence.[8] The jury found the six defendants-appellants guilty of conspiracy. It did so after being properly instructed by Judge Korman with respect to any evidence presented at trial regarding contacts between United Brooklyn and other coalitions and the activities of other coalitions:
 
 
 108
 I also wish to instruct you that, while you may have heard evidence of cooperation between members of the United Brooklyn and other coalitions, the conspiracy alleged in Count One does not encompass an agreement between the defendants and members of other coalitions.
 
 
 109
 If the only agreement you find a defendant entered into was with the member[s] of other coalitions ... then you must acquit that defendant.
 
 
 110
 See Johansen, 56 F.3d at 350 (whether the government has proved single or multiple conspiracies "is a question of fact for a properly instructed jury.")
 
 
 111
 The evidence at trial was sufficient to establish the existence of a single conspiracy and Merton Taylor's participation in it. The evidence regarding other coalitions was extremely limited (some of it was elicited by defendants on cross-examination) and did not raise the possibility that the jury might reasonably find the existence of multiple conspiracies.[9] There was no variance. Under the circumstances, we need not consider Taylor's claim of prejudice.
 
 C. Sufficiency of the Evidence
 
 112
 Defendants Nelson, Alonso and Collazo attack the sufficiency of the evidence supporting their convictions. A defendant challenging the sufficiency of the evidence must demonstrate that "viewing the evidence in the light most favorable to the government, ... no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." United States v. Brewer, 36 F.3d 266, 268 (2d Cir.1994) (internal quotations and citation omitted). This standard of deference is especially important when reviewing a conviction of conspiracy. United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir.1992).
 
 1. Darren Nelson
 
 113
 Nelson argues that there was insufficient evidence to support his conspiracy conviction because the government failed to meet its burden of proving beyond a reasonable doubt that the labor exception did not apply. Nelson was acquitted on all four of the substantive extortion counts charged against him, and he claims that the conspiracy conviction was a compromise verdict.
 
 
 114
 As previously noted, the labor exception applied only to efforts to obtain jobs, and did not apply to efforts to obtain coordinator's fees or contracts. The government did not have to disprove Nelson's claim that his conduct fell under the labor exception in the latter respect. The government's proof was sufficient for a reasonable jury to find that Nelson knew of the existence of a scheme to obtain coordinators' fees and contracts and that he knowingly joined and participated in it. See Pitre, 960 F.2d at 1121.
 
 
 115
 Donald Collins testified that Nelson and the Collins brothers took out the shape and stopped jobs together. Nelson was associated closely with Matthew Taylor (who was found guilty in the first trial), and was aware of Taylor's efforts to extort contracts from Turner Construction Company. Nelson received coordinator's fees from both Dedonna Construction and Crossbay Construction Company. Although this evidence concerned different companies than the ones mentioned in the substantive counts against Nelson, it was enough to draw the inference that Nelson knowingly joined and participated in the conspiracy. Nelson's acquittal on the substantive counts does not preclude a jury from finding him guilty of conspiracy. See United States v. Bagaric, 706 F.2d 42, 67-68 (2d Cir.), cert. denied, 464 U.S. 840, 104 S.Ct. 133, 134, 78 L.Ed.2d 128 (1983). Although Nelson complains that the bulk of this testimony came from cooperating witnesses, we must defer to the jury's resolution of any questions as to the credibility of witnesses. See United States v. LeRoy, 687 F.2d 610, 616 (2d Cir.1982), cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).
 
 2. Angel Alonso
 
 116
 Alonso argues, generally, that the evidence was insufficient to support his convictions for conspiracy and for the extortion of Arson Demolition Company and, specifically, that the government failed to prove that he obstructed, delayed or affected commerce, or conspired to do so, under the definition of 18 U.S.C. § 1951(b)(3).
 
 
 117
 A review of the record shows that there was sufficient evidence for a reasonable jury to find Alonso's awareness of and participation in the conspiracy and his extortion of Arson Demolition. In addition, the extortionate activities of United Brooklyn interfered with interstate commerce both directly, because some of the construction projects targeted involved airports, highways or government buildings, and indirectly, by depleting the funds available to the targeted contractors for the purchase of goods and supplies in interstate commerce. See United States v. Bolton, 68 F.3d 396, 398-99 (10th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996).
 
 3. Ruben Collazo
 
 118
 Collazo contends that the evidence against him was insufficient to support his convictions for conspiracy and for the extortion of Gateway Demolition. Collazo describes his role in United Brooklyn as merely a "go-fer" and an "occasional scout" for new job sites. He also contends that the evidence shows that far from committing extortion against Gateway Demolition, he prevented an extortion against Gateway by another coalition.
 
 
 119
 A review of the record shows that the evidence was sufficient to support his convictions. A reasonable jury could have found that any effort Collazo may have made to prevent another coalition from disrupting the work of Gateway Demolition was a component of the United Brooklyn extortion in that it helped to convince the contractor of the need to pay for labor peace.
 
 D. Sentencing
 1. Shannon Richards
 
 120
 Richards was convicted of conspiracy and one substantive count of extortion. He was given a two-level enhancement, pursuant to U.S.S.G. § 2B3.2(b)(3)(A), because firearms were possessed in furtherance of the conspiracy. Richards argues that this enhancement was improper because the district court made no finding that the possession of firearms by co-conspirators was within the scope of the activity that Richards agreed to undertake. Relying on the application notes to U.S.S.G. § 1B1.3 and on United States v. Studley, 47 F.3d 569, 574-75 (2d Cir.1995), he claims that in order to justify the enhancement, he must have "intentionally agreed and adopted the possession of firearms to further the aims of the conspiracy" and there was no proof that he did.
 
 
 121
 Judge Korman carefully considered the purpose and extent of firearms use in relation to the conspiracy in connection with the sentencing of Darren Nelson.[10] He recognized that there was a "degree of ambiguity here about the initial motivation for the use of weapons," in that the original "arming" of United Brooklyn may have been in order to protect itself from other coalitions. This ambiguity influenced Judge Korman to depart from the application of a five-level firearms enhancement pursuant to U.S.S.G. § 2B3.2(b)(3)(A) and apply a two-level enhancement instead.
 
 
 122
 The judge found with respect to Richards that "the evidence is quite clear that [firearms were] used in furtherance of the conspiracy in which [Richards] was a member and that it was contemplated and foreseen and understood by him, and I also believe that he himself carried a weapon." In Studley, we held that under the 1992 amendment to U.S.S.G. § 1B1.3 a defendant could not be held responsible, for the purposes of sentence calculation, for the conduct of others unless the district court finds (1) that the conduct was within the scope of the criminal activity jointly undertaken and (2) that the conduct was foreseeable to the defendant. 47 F.3d at 574.
 
 
 123
 Judge Korman's findings meet the requirements of Studley. He found that the use of firearms was "contemplated" by Richards as part of the conspiracy and that it was foreseeable. Both conclusions are supported by the record. Richards was closely associated with Merton Taylor, who was carrying a gun in connection with his activities with United Brooklyn. Richards was also present at the United Brooklyn office and working on its behalf after guns were distributed to a number of its members. In addition, there was testimony that Richards himself carried a gun in relation to his work with United Brooklyn.
 
 
 124
 Richards argued in the district court that he was entitled to a downward adjustment based on his acceptance of responsibility for his crime. Judge Korman said that Application Note 2 of U.S.S.G. § 3E1.1 prevented him "on the face of the evidence in this case" from considering such an adjustment for Richards. Richards says that this showed the judge erroneously thought he was precluded from even considering the claim. Richards goes on to argue that even though his acceptance of responsibility came after conviction at trial, he is entitled to a downward adjustment because (1) he severed all ties with United Brooklyn seven months before he was arrested; and (2) he did not dispute the factual basis for his conviction because his defense was that his actions fell under the labor exception to the Hobbs Act.
 
 
 125
 The argument is not persuasive. Richards has not shown that he qualifies as one of the "rare" exceptions to the rule that acceptance of responsibility will not benefit those who put "the government to its burden of proof at trial by denying the essential factual elements of guilt ..." See U.S.S.G. § 3E1.1, Application Note 2. Richards's defense was that his conduct was not a crime, but was a legitimate attempt to further minority hiring in the New York construction industry. This cannot be characterized as a pre-conviction acceptance of responsibility when the jury rejects that defense and the defendant is convicted. From the record before us, it is clear that Judge Korman was fully aware of the appropriate circumstances for a downward departure, and properly decided that in this case it was not appropriate. See United States v. Reyes, 9 F.3d 275, 280 (2d Cir.1993) (acceptance of responsibility is a factual question overturned only if "without foundation").
 
 2. Angel Alonso
 
 126
 Alonso was convicted of conspiracy and one substantive count of extortion. The district court applied a two-level enhancement to his sentence pursuant to U.S.S.G. § 2B3.2(b)(1) because the extortion offense involved an implied threat of bodily injury. Alonso was also given the same two-level firearms enhancement, for the same reasons, that Nelson and Richards received.
 
 
 127
 Alonso argues that the threat of bodily injury enhancement was improper as it punished him twice for the same conduct. Alonso claims that extortion under 18 U.S.C. § 1951 is by definition a crime that involves the "wrongful use of actual or threatened force, violence or fear." See 18 U.S.C. § 1951(b)(2). Therefore, his argument continues, the base offense level for extortion already contemplates that violence was associated with the crime.
 
 
 128
 Alonso did not object to this enhancement in the district court, so this argument was not properly preserved for review. Moreover, even if we review the enhancement for plain error, see United States v. Keppler, 2 F.3d 21, 23-24 (2d Cir.1993), we reject the argument. The statute and the enhancement are not coextensive. Extortion punishable under 18 U.S.C. § 1951 can involve a threat of injury to the victim's property or other economic harm, as distinct from physical harm. See United States v. Capo, 817 F.2d 947, 951 (2d Cir.1987) (in banc); United States v. Penn, 966 F.2d 55 (2d Cir.1992) (per curiam) (applying § 2B3.2 to case involving economic harm); see also U.S.S.G. § 2B3.2, Application Note 2. The sentence enhancement requires "an express or implied threat of death, bodily injury or kidnapping." U.S.S.G. § 2B3.2(b)(1). The enhancement therefore singles out extortions involving threats of physical harm for greater punishment. See United States v. Jones, 997 F.2d 967, 969-70 (1st Cir.1993).
 
 
 129
 Alonso also argues that the firearms enhancement was improper because (1) the district court recognized that the firearms possessed by United Brooklyn members were not used in furtherance of extortion but to protect themselves from rival coalitions; and (2) the jury acquitted him of carrying a firearm in connection with the conspiracy in violation of 18 U.S.C. § 924(c).
 
 
 130
 Notwithstanding the "ambiguity" noted earlier with respect to the initial possession of firearms, Judge Korman ultimately found that "the evidence clearly shows that guns were carried on the shape [and] that it was to further the extortionate aims of the conspiracy." This was sufficient to apply the enhancement. Furthermore, Alonso's acquittal on the firearms count does not preclude the use of this conduct to enhance his sentence. The judge could still find, based on a preponderance of the evidence, that Alonso carried a firearm in furtherance of the conspiracy, see United States v. Rodriguez-Gonzalez, 899 F.2d 177, 182 (2d Cir.), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), or that Alonzo was responsible for the firearms possession of his co-conspirators, see United States v. Medina, 74 F.3d 413, 417 (2d Cir.1996) (per curiam); U.S.S.G. § 1B1.3(a)(1)(B).
 
 
 131
 Alonso also argues that he was entitled to a downward adjustment pursuant to U.S.S.G. § 3E1.1 because prior to sentencing he wrote a letter to the district court in which he allegedly accepted responsibility for his actions. He also claims that he should have been granted a downward adjustment pursuant to U.S.S.G. § 3B1.2(b) because, at least in comparison to the leadership of United Brooklyn indicted along with him if not the entire membership of the coalition, he played a minor role in the conspiracy.
 
 
 132
 As with the determination of Richards's entitlement to a departure for acceptance of responsibility, Judge Korman correctly determined that Alonso's situation was not one of those "rare" cases in which the departure would apply after conviction at trial. Alonso has pointed to no "pre-trial statements and conduct" that would entitle him to such a departure. U.S.S.G. § 3E1.1, Application Note 2. Judge Korman characterized any acceptance of responsibility by Alonso as a reassertion of the claim, rejected by the jury at trial, that the labor exception to the Hobbs Act applied. Alonso has not shown that this determination is without foundation.
 
 
 133
 Finally, this court has recently made clear that in order to have his offense level reduced because of his limited role in the conspiracy, Alonso had to convince the district court that he was substantially less culpable than the average participant in this type of extortion. See United States v. Pena, 33 F.3d 2, 3 (2d Cir.1994); United States v. Ajmal, 67 F.3d 12, 18 (2d Cir.1995). The evidence adduced at trial demonstrates that Alonso did not meet this burden. He took out the shape and forced contractors to call the leaders of United Brooklyn to prevent further disruption of their work. Certainly, Judge Korman did not clearly err in refusing to find that Alonzo was "less culpable than most other participants" in the conspiracy. See U.S.S.G. § 3B1.2, Application Note 3.
 
 
 134
 We have considered all of defendants' arguments and they are without merit. The judgments of conviction are affirmed.
 
 
 
 [1]
 The second group consisted of eight defendants. Two are not participating in this appeal; one was severed from the trial because of illness, and the other was acquitted
 
 
 [2]
 The judge made it clear to the jury that the exception did not apply to efforts to obtain jobs from contractors whom defendants reasonably believed did not discriminate or violate employment laws, or to efforts to obtain money, wages for unwanted or superfluous employees, contracts or other valuable consideration
 
 
 [3]
 The Magistrate had also presided over jury selection in the first trial. Peter Kirchheimer, Clarke's counsel below, was the only defense counsel in this case who also participated in the first trial (representing a different defendant)
 
 
 [4]
 Ten jurors were excused for cause on account of their views or experiences regarding minorities, minority hiring or minority labor coalitions
 
 
 [5]
 As above noted, the Magistrate's decision to reinstate jurors 3 and 4 was affirmed by Judge Korman. In this court, defendants have not specifically attacked that ruling
 
 
 [6]
 Juror 26--reinstated by Judge Korman--was never seated on the petit jury because the judge permitted him to be struck by defendants during the selection of the alternate jurors. The propriety of that decision is not before us
 
 
 [7]
 That right is not a constitutional right, see Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988), and in a criminal trial is exercised pursuant to Fed.R.Crim.P. 24(b)
 
 
 [8]
 As noted earlier in this opinion, the superseding indictment departed in this respect from the theory of the original indictment, which charged one large conspiracy among a number of coalitions
 
 
 [9]
 For this reason it was not error for the court not to describe more explicitly the possibility of multiple conspiracies in its instruction. See United States v. Cambindo Valencia, 609 F.2d 603, 625 (1979), cert. denied, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980)
 
 
 [10]
 His conclusions were then applied to the sentencing of Richards and Alonso