273 F.3d 91 (2nd Cir. 2001)
 UNITED STATES OF AMERICA, Appellee,
v.
ERIC MULDER, also known as Unique, Defendant,
DENNIS MCCALL, also known as B-Boy, DANIEL HUNTER, also known as Tyborne, TREVOR JOHNSON, and ROBERT CARNES, also known as Jamal, Defendants-Appellants.
 Nos. 99-1516 (LEAD), 99-1523 (CON), 99-1531 (CON), 99-1538 (CON)
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 September 21, 2000, Argued
November 1, 2001, Decided
Amended November 9, 2001.
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 MYLAN L. DENERSTEIN, Assistant United States Attorney, Southern District of New York, New York, NY (Mary Jo White, United States Attorney, Southern District of New York, Mark A. Godsey and Christine H. Chung, Assistant United States Attorneys, on the brief) for Appellee.
 ANTHONY J. FERRARA, Polstein, Ferrara, Dwyer & Speed, P.C., New York, NY (Marie Castellitto and Bridget A. Short on the brief) for Defendant-Appellant Dennis McCall.
 ANDREW A. RUBIN, Mancuso, Rubin & Fufidio, White Plains, NY, for Defendant-Appellant Daniel Hunter.
 STEPHEN P. SCARING, Stephen P. Scaring, P.C., Garden City, NY, for Defendant-Appellant Trevor Johnson.
 MARILYN S. READER, Law Office of Marilyn S. Reader, Larchmont, NY, for Defendant-Appellant Robert Carnes.
 Before: FEINBERG, MINER, and POOLER, Circuit Judges.
 POOLER, Circuit Judge:
 
 
 1
 Defendants-Appellants Dennis McCall, Daniel Hunter, Trevor Johnson, and Robert Carnes, belonged to Brooklyn Fight Back ("BFB"), a labor coalition that extorted money and jobs, including no-show jobs, from contractors operating in New York City. After a jury convicted the defendants of conspiracy to violate the Hobbs Act, the district court (Richard Conway Casey, J.) sentenced them to terms of imprisonment ranging from seventeen to twenty years. These harsh sentences resulted from the district court's finding that the murder of a rival coalition member by defendants' co-conspirator, Eric Mulder, was relevant conduct for purposes of calculating the sentences of each of the defendants. We affirm defendants' convictions but because the district court failed to determine the scope of each defendant's agreement before finding that the co-conspirator's conduct was reasonably foreseeable to all of the defendants, we vacate the sentences and remand for resentencing.
 
 BACKGROUND
 
 2
 BFB claims that it used time-honored tactics of the labor movement to obtain jobs for members of minority groups on construction projects. However, the proof offered at trial demonstrated that at least during the time covered by the indictment - 1990 through 1998 - BFB extorted construction company owners to provide laborer jobs for BFB members, who then paid BFB's leaders a portion of their salaries. Although the coalition members hired were minorities, there is no indication in the record that BFB's activities increased the presence of minorities in the workforces at the companies they extorted or that the companies where they placed workers discriminated. BFB leaders also used threats of slowdowns or work stoppages and sometimes relied on their coalition's reputation for violence to obtain no-show jobs as coalition coordinators for themselves. The coalition coordinators' only function was to fend off rival coalitions that also wanted jobs at the site. During the course of the conspiracy, BFB member Eric Mulder killed a member of a rival coalition, Erick Riddick.
 
 
 3
 By indictment filed January 20, 1998, a grand jury charged each of the appellants and Eric Mulder with one count of conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. 1951. This original indictment identified the period of the conspiracy as being between January 1995 and January 20, 1998. A first superceding indictment filed July 7, 1998, added a substantive count of extortion related to Johnson's, Carnes', and McCall's activities at the DeFoe Corporation. A second superceding indictment filed October 1, 1998, changed the date of the conspiracy's beginning from January 1995 to January 1990. It also added a lengthy preamble describing the illegal role and actions of labor coalitions in general and alleged that the various coalitions competed for control of companies, that the competition sometimes escalated into violence, and that Johnson, Carnes, and McCall worked with members of the Gambino crime family to protect their mutual interests.
 
 
 4
 At a six-week trial beginning on November 2, 1998, Mulder testified against his co-defendants pursuant to a cooperation agreement. In addition to Mulder and other fact witnesses who testified to defendants' activities at the construction sites, the government offered tapes and transcripts of conversations among the defendants and between the defendants and some of their victims. The government also offered the testimony of two experts, Daniel O'Rourke and James McNamara.
 
 
 5
 The jury returned a verdict acquitting all charged defendants on the substantive count but convicting all defendants on the conspiracy count. Attributing the Riddick murder to each of the defendants as relevant conduct, the district court sentenced Johnson to twenty years of imprisonment and the remaining defendants to seventeen years of imprisonment.
 
 
 6
 This appeal followed. Defendants contend that (1) they were prejudiced by the government's eve-of-trial amendments of the indictment and presentation of proof not set forth in the original bill of particulars; (2) the court erred by admitting McNamara's and O'Rourke's testimony and made other evidentiary errors; (3) the charge included an erroneous definition of the labor exception to Hobbs Act liability, and the court abused its discretion by declining to give a supplementary charge on fear; (4) the court wrongfully declined to excuse two jurors who complained of financial hardship; (5) the court intervened excessively during defendants' questioning, and the prosecutor made prejudicial comments; (6) there was insufficient evidence to support the verdict; and (7) the district court erroneously attributed Riddick's murder to them as conduct relevant for sentencing purposes and made various other sentencing errors.
 
 DISCUSSION
 
 7
 I. Changes in the Indictment and Bill of Particulars
 
 
 8
 Defendants contend that the district court erred by allowing the government to expand the time span of the conspiracy and add prejudicial surplusage concerning the violent nature of labor coalitions in its second superceding indictment filed about three weeks before trial.
 
 
 9
 Because the court offered defendants additional time to prepare, which they declined, they cannot establish prejudice from the timing of the amendment. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990) (internal quotation marks omitted). Because the six challenged paragraphs, which generally described the tactics and purposes of labor coalitions, discussed background evidence that was properly admissible and relevant,[1] the district court did not err by refusing to strike these paragraphs from the indictment.
 
 
 10
 On August 27, 1998, Judge Casey directed the government to give defendants a bill of particulars containing the names of the contractors, construction sites, and projects targeted by the conspiracy. The government did not comply until defendants complained in early October 1998. After furnishing belated particulars, Assistant United States Attorney Mylan Denerstein explained to the court that she had not received its order. Denerstein also explained that she could not always give specific sites because defendants sometimes acted as coordinators for entire sectors of a company's business.
 
 
 11
 On November 9, 1998, during the trial, the government amended its bill of particulars to add specific HHM Construction sites about which Eric Mulder would testify as a result of his November 2, 1998, plea agreement. The government also added Tully Construction Company's Union Street, Queens, site and informed defense counsel that this site was discussed in wiretap tape transcripts given to defendants on October 26, 1998. A November 13, 1998, letter added two additional sites. Defendants requested that the court preclude the government from offering evidence concerning the new sites, but the court denied this request.
 
 
 12
 "A bill of particulars may be amended at any time subject to such conditions as justice requires." Fed. R. Crim. P. 7(f). However, the defendants argue that they were prejudiced because the November 9, 1998, amendment allowed the government to present proof of a shoot out at Tully Construction's Union Street site. The first witness concerning the Union Street site testified on December 1, 1998. In addition, defense counsel had access to tapes of conversations concerning the sites as early as February 26, 1998. Because the circumstances of the disclosure and the timing of the subsequent testimony protected defendants against prejudice, Judge Casey did not abuse his discretion by allowing the belated amendment. Cf. United States v. Barnes, 158 F.3d 662, 665-66 (2d Cir. 1998) (approving complete denial of a bill of particulars).
 
 II. Evidentiary Issues
 A. Expert Testimony
 
 13
 Over strong objection from the defendants, the court allowed Daniel O'Rourke and James McNamara to testify as experts.
 
 
 14
 O'Rourke, who supervised the New York City Police Department Construction Task Force between 1986 and 1996, testified that the percentage of minorities at construction work sites did not correlate with coalition activity at the site; coalition coordinators visited work sites and demanded no-show jobs in return for protection from other coalitions; coalitions disrupted work if they were not given jobs, causing the companies economic loss; coalition coordinators also demanded laborer jobs for some of their members; laborers kicked back a portion of their salaries to the coalition; contractors were extremely vulnerable to implied threats from coalitions because they had to leave expensive equipment exposed at the job site and could not afford delays; and violence between rival coalitions sometimes erupted at the work sites. He identified BFB as one of the major coalitions in New York City and named Johnson as its leader, McCall as a coordinator, and Carnes, whom he knew as Jamal, as an associate. O'Rourke did not give any specific testimony concerning BFB's activities.
 
 
 15
 McNamara, who has worked in several city and state positions targeted at ensuring that minorities have equal opportunities in the building trades and who has done research in that area, testified that studies in 1970 showed that only 22% of laborers at construction sites were minorities; by 1980, the percentage had increased to 40%; and there has been a continued gradual increase in the number of minority workers largely because white workers have moved out of the city, creating more opportunities for minorities. McNamara suggested that placement of minority laborers at job sites by coalitions did not increase the overall percentage of minorities because the coalitions often demanded that the contractors fire existing minority workers who were not members of the threatening coalition.
 
 
 16
 Defendants object to the testimony of McNamara and O'Rourke on the following bases: (1) the subjects on which they testified could have been explained by fact witnesses and were not beyond the common sense experience of the jury; (2) the experts' testimony relied on hearsay; (3) the government impermissibly used expert testimony rather than victim testimony to fill in the gaps in their factual case; and (4) the court did not conduct a reliability inquiry - which would have demonstrated the lack of reliable foundation for the experts' opinions.
 
 
 17
 A district court can admit expert testimony from a person "qualified as an expert by knowledge, skill, experience, training, or education," assuming that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As with any other relevant evidence, the court should exclude expert testimony if its prejudicial effect substantially outweighs its relevance. Fed. R. Evid. 403. In addition, the district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991) (internal quotation marks omitted). Nor should it allow proof of the practices of a certain group of criminals to show that a defendant most likely engaged in a particular practice. Id. at 1234-35 (holding that combination of admission of testimony that drug dealers in a particular neighborhood frequently forced customers to ingest cocaine at gun point coupled with government's frequent invitation to jurors to infer from the general testimony that defendant used a gun in his transaction with an undercover officer required reversal). This court will overturn the district court's exercise of discretion in admitting expert testimony "only where the decision is manifestly erroneous." United States v. Cruz, 981 F.2d 659, 662 (2d Cir. 1992) (internal quotation marks omitted).
 
 
 18
 Defendants' first argument -- that the experts' testimony should have been barred because the matters on which they testified, and particularly the structure of a labor coalition, are common knowledge or common sense -- is unfounded. Labor coalitions and their goals are not well known or commonly understood. Nor are their history and tactics. We have upheld expert testimony on the structure and tactics of the Mafia, United States v. Locasio, 6 F.3d 924, 936 (2d Cir. 1993), and, by virtue of television, best selling novels, and the movies, the Mafia is far better known to the general public than are labor coalitions. Defendants do not contend - nor could they - that the average citizen knows much about minority representation in the construction trades. Therefore, the district court did not err by finding that both O'Rourke and McNamara had specialized or expert knowledge.
 
 
 19
 Defendants' second contention - that the district court impermissibly allowed the experts to rely on multiple hearsay - lacks merit because "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." Id. at 938. O'Rourke relied largely on the statements of detectives he supervised, victim contractors, and informants to form his opinions. Each of these sources normally would be relied on by expert police officers. McNamara explicitly relied on published reports concerning the participation of minority workers in the construction industry, again a normal source of information for an expert.
 
 
 20
 Nor, as defendants contend, must the district court make specific findings on the reliability of the materials the experts use. Id. at 938-39. Instead, we "assume that the district court consistently and continually performed a trustworthiness analysis sub silentio of all evidence introduced at trial." Id. at 939.
 
 
 21
 Finally, the government did not use the expert testimony to suggest that defendants were guilty of extortion because other members of minority coalitions committed extortion. The government is free to offer expert testimony both as background for an offense and to assist in proving one or more elements of the offense. United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988). What the government cannot do is to ask the jury to find that because criminals of a certain type classically engage in a certain kind of behavior, the defendant engaged in that behavior. See, e.g., Castillo, 924 F.2d at 1234 ("We take serious issue with the Government's use of an expert witness to propound the impermissible theory that appellants' guilt could be inferred from the behavior of unrelated persons."). Cruz, 981 F.2d at 661-63. Here, O'Rourke's testimony gave the jury background that would enable them to understand how coalitions functioned and why a contractor might be fearful when a number of coalition members threatened to shut down a job site. McNamara's testimony bore on the issue of intent. Because, according to his testimony, minorities were already well-represented as laborers in the construction industry, it is less likely that coalitions that seek only to have additional or replacement minority laborers and a no-show coordinator hired are motivated by a desire to increase minority participation in the workforce. Not only has the government established a legitimate purpose for introduction of the expert testimony, but it also did not use the expert testimony to create inferences about individual defendants' actions in the way that Cruz and Castillo condemn. Moreover, the court explicitly instructed the jury that "you have heard testimony that minority coalitions have a history of violence. Whether you accept this opinion or not, you may not infer that any defendant was guilty of participating in criminal conduct solely because he is a member of a minority labor coalition." Thus, there was no error in the district court's admission of the expert testimony.
 
 B. Hearsay
 
 22
 McCall argues that the trial court erred by permitting William Marshall and others to testify to statements -- primarily concerning BFB's ties to the Gambino family -- others had made to them or in their presence.
 
 
 23
 With respect to Marshall, McCall principally argues that the district court did not have sufficient evidence of a conspiracy between BFB and the Gambino family to allow Marshall to testify to out-of-court statements by Craig and Greg Depalma, who along with Marshall belonged to the Gambino family. He also argues that some of the statements were merely idle chatter and therefore not in furtherance of the conspiracy.
 
 
 24
 "Extra-judicial statements by co-conspirators may be admitted if the government establishes by a preponderance of the evidence that there was a conspiracy, that both the declarant and the party against whom the statements are offered were members of the conspiracy, and that the statements were made during and in furtherance of the conspiracy." United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996). The trial court may consider the hearsay statements themselves in determining whether there was a conspiracy, but because these statements are presumptively unreliable, it must also find some independent corroborating evidence. Id. Here, Marshall testified concerning meetings Gambino family members and BFB members held to reach an agreement on the number of workers BFB could place at Defoe; videotape and surveillance evidence corroborated his account of meetings between the Depalmas and Carnes and Johnson at the Baychester Diner; and admissions by Carnes established that BFB agreed to help Marshall, a Gambino family member, at Halmar in exchange for a no-show pay job for BFB at Halmar. Therefore, the district court's preliminary finding of a conspiracy that included members of the Gambino family was adequately supported.
 
 
 25
 Defendants also argue that the co-conspirator statements elicited through Marshall were merely narrative statements of conversations between the Depalmas or Amicucci, a principal in Defoe, and Johnson, Carnes, or McCall, and therefore did not further the conspiracy. Although "mere idle chatter" or narrative descriptions by one co-conspirator to another are not in furtherance of a conspiracy, "statements between coconspirators that . . . inform each other as to the progress or status of the conspiracy" do further the conspiracy. United States v. Maldonado-Rivera, 922 F.2d 934, 958-59 (2d Cir. 1990) (internal quotation marks omitted); see also United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994). Here, the Depalmas gave Marshall information concerning their negotiations with BFB. This information furthered the conspiracy by keeping Marshall apprised of the delicate arrangements for extorting Defoe and by letting him know that others had information concerning the Depalmas' organized crime ties.
 
 
 26
 We have reviewed defendants' remaining hearsay arguments and find that they also lack merit.
 
 C. Reputation Evidence
 
 27
 Finally, McCall argues that the district court erred by admitting evidence of the bad reputation enjoyed by BFB and coalitions in general because there was no evidence that McCall capitalized upon the general reputation of coalitions, identified himself to contractors as a coalition member, or threatened violence. Bad reputation is relevant to the fear element in a Hobbs Act conspiracy "since such a reputation frequently conveys a tacit threat of violence." United States v. Tropiano, 418 F.2d 1069, 1081 (2d Cir. 1969). McCall points out that the defendant in Tropiano actually had threatened his victim, id. at 1072, and argues that the absence of a direct threat differentiates his situation. However, the holding in Tropiano did not rest on the defendant's threats. Id. at 1081. Because the jury that convicted McCall and his co-defendants heard testimony that the victim contractors were aware of BFB's reputation and experienced fear because of actions taken by McCall or his co-conspirators, we reject this challenge.
 
 III. Charge Issues
 
 28
 Defendants claim that the district court erred by refusing to add language that they proposed to its definition of the "labor exception" to Hobbs Act culpability and by failing to define fear adequately.
 
 A. Labor Exception
 
 29
 The Hobbs Act prohibits, inter alia, interference with commerce by extortion. 18 U.S.C. 1951(a). The Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. 1951(b)(2).
 
 
 30
 There is a labor exception to culpability for Hobbs Act extortion. United States v. Enmons, 410 U.S. 396, 401, 35 L. Ed. 2d 379, 93 S. Ct. 1007 (1973). Thus, the Act "does not apply to the use of force to achieve legitimate labor ends." Id. Legitimate labor ends include increasing the number of minorities hired by a contractor that the defendant reasonably believes discriminates against minorities. United States v. Taylor, 92 F.3d 1313, 1319 (2d Cir. 1996). However, the use of force for "the achievement of illegitimate objectives by employees or their representatives, such as the exaction of personal payoffs, or the pursuit of 'wages' for unwanted or fictitious services," is not exempt from the Act. Enmons, 410 U.S. at 407. Judge Casey used the following language in explaining the difficult concepts underlying the labor exception to the jury:
 
 
 31
 The Hobbs Act, which describes the crime of extortion, does not apply to labor disputes in which workers seek to obtain lawful and legitimate labor objectives. A labor dispute can include good-faith efforts to obtain jobs for minorities from contractors or subcontractors who the defendants reasonably believe discriminate against minorities in hiring employees, or who the defendants reasonably believe failed to obey the law regarding the employment of minorities.
 
 
 32
 This exception does not imply that violence is lawful or proper in general. Obviously, it is not. Therefore, the labor exception to the Hobbs Act does not apply to efforts to obtain jobs from contractors whom the defendants reasonably believed did not discriminate or violate employment laws, or to efforts to obtain money or wages for unwanted or superfluous employees[,] no show-jobs[,] or contracts, or other valuable consideration.
 
 
 33
 Nor does it apply to the charge of using coercive or extortive means in order to force an employer to place a person on his or her payroll solely in exchange for preventing that person or other people or organizations he is associated with from disrupting work.
 
 
 34
 If you find that any defendant engaged in such conduct, then you might find him guilty of extortion, if the other elements of the crime have been proven.
 
 
 35
 The government has the burden of proving beyond a reasonable doubt that the labor exception does not apply.
 
 
 36
 Just before explaining the labor exception, the court instructed the jury, "that force, violence or fear . . . used . . . to obtain property [was] wrongful" and that the jury did not need to determine whether the defendants believed the property was legitimately theirs.
 
 
 37
 The defense asked that the court insert the following language in the second paragraph of the labor exception charge immediately after, "This exception does not imply that violence is lawful or proper in general. Obviously it is not":
 
 
 38
 Acts of violence are prohibited by other laws. Whether or not such laws have been violated here, however, is irrelevant to the issue that you have to consider. The issue here is whether the defendants have violated this specific statute - the Hobbs Act.
 
 
 39
 A labor dispute, within the labor exception to the Hobbs Act, is a dispute between an employer and an individual employee, a group of employees, a representative of employees or any group of individuals seeking legitimate employment with an employer. The dispute need not involve representatives of recognized labor unions nor need it involve claims of contract violations by the employer. It can include good faith attempts to obtain jobs for minorities from contractors or subcontractors.
 
 
 40
 Although the government did not object to inclusion of this language, the court declined to adopt it. Defendants requested, in the alternative, that the court remove the word, "Therefore," immediately after "Obviously, it is not" and before "the labor exception does not apply" and begin a new paragraph with "The labor exception does not apply." The Court also declined to make this change.
 
 
 41
 We review jury instructions de novo. United States v. Pujana-Mena, 949 F.2d 24, 27 (2d Cir. 1991). To succeed in their challenge, defendants must show "that the requested charge accurately represented the law in every respect and that, viewing as a whole the charge actually given, [they were] prejudiced." Id. (emphasis added and internal quotation marks omitted). We must also look to "the charge as a whole" to determine whether it "adequately reflected the law" and "would have conveyed to a reasonable juror" the relevant law. United States v. Jones, 30 F.3d 276, 284 (2d Cir. 1994).
 
 
 42
 Defendants' proposed language is legally correct and may have helped the jury better understand the counter-intuitive proposition that the use of violence in a labor dispute does not violate the Hobbs Act. However, the court's charge also was correct. It states that the labor exception applies to efforts to induce the hiring of minorities under certain circumstances but does not allow labor coalitions to coerce the hiring of minorities if the coalition lacks a reasonable belief that the targeted employer discriminated or, under any circumstances, to force the hiring of coalition coordinators for no-show jobs. See Taylor, 92 F.3d at 1319 n.2, 1333 (holding that labor exception does not apply to efforts to obtain coordinator's fees or contracts and noting that the district court "made it clear to the jury that the exception did not apply to efforts to obtain jobs from contractors whom defendants reasonably believed did not discriminate or violate employment laws, or to efforts to obtain money, wages for unwanted or superfluous employees, contracts or other valuable consideration").[2] Moreover, a reasonable juror would have understood the court's charge correctly. The district court defined the labor exception immediately after defining the "wrongfulness" element of the Hobbs Act and stated that the labor exception constituted an exception "to this aspect of wrongfulness." The juxtaposition of the two portions of the charge indicates that use of fear in the service of legitimate labor goals including increased hiring of minorities is not wrongful and is within the labor exception.
 
 B. Fear
 
 43
 Defendants also urge that the court erred by refusing to give a supplemental charge instructing that a defendant's attempt to make a victim fearful must be wrongful in order to subject the defendant to Hobbs Act liability after the jurors asked several questions concerning the definition of extortion.
 
 
 44
 On December 11, the jury asked the court to "define the words 'willfully', unlawfully' and 'knowingly.'" At the same time, the jury submitted another note that said:
 
 
 45
 On p. 27, P 1, "fear" is defined to include fear induced by persons other than the defendants. On p. 27, P 3 and p. 28, P 3, your use of "fear" implies that it must have been induced by the defendants. Which is correct? Can defendants be held liable on count two if they exploit fear induced by others? Is that wrongful? What if the fear is of economic loss induced by others?
 
 
 46
 Defendants responded by asking the court to further explain the word wrongful in "wrongful use of actual or threatened force or violence or fear" by saying, "wrongful in this context means that, for each defendant named in the count under consideration, the defendant's specific purpose in using or threatening force or violence or in seeking to induce fear must have been for a prohibited purpose." They also asked the court to explain once more that "it is not wrongful under the statute to use or threaten force or violence or to protest job sites or to picket or induce fear to obtain legitimate good faith labor goals . . . . including good faith efforts to obtain genuine jobs or higher wages for minorities." Defendants further suggested that the court erred in its initial charge by defining "wrongful" as meaning "that the defendants' purpose in using the threatened force or violence, or in inducing fear, must have been to obtain property from the victim in the count you are considering."
 
 
 47
 Rather than adopt defendants' language, the court reread a portion of the charge indicating that the defendants' knowing and willful exploitation of fear caused by others would be wrongful, read the definitions of unlawfully, knowingly, and willfully, and referred the jury to the charge as a whole.
 
 
 48
 On Monday, December 14, the jury submitted three pertinent notes. One asked, " In order to find that Defoe had 'fear' for purposes of Count II, is it sufficient if any of the following persons - John Amicucci, Craig DePalma, Ed Schluter or Bobby Colella [the president and several high-level employees of Defoe] - had 'fear'?" Another said:
 
 
 49
 Drawing your attention to the fear element of the extortion charge, can a corporation be deemed to have the human emotion of fear when it acts in a purely rational manner? To be specific, if we find:
 
 
 50
 (a) Defoe knew there could be a job stoppage if it did not deal with defendants; (b) Defoe knew it would lose money if there was a job stoppage; (c) Defoe did not want to lose money; and (d) for these reasons Defoe dealt with defendants,
 
 
 51
 does this compel a finding of the fear element of extortion, notwithstanding that at all times Defoe acted in a purely rational[] and business[-]like manner, devoid of human emotion?
 
 
 52
 Later that same day, the jurors submitted a similar note, adding the concept that the corporation could act through its agents and employees. In response to the notes, the court informed the jury that it could consider the state of mind of any Defoe employee and told the jurors that whether Defoe acted in a rational and business-like manner was not an element of extortion, adding -- over the objection of all counsel -- "it is unclear to me why you include in your question the phrase that Defoe acted through its officers, employees and agents at all times in a purely rational and business manner."
 
 
 53
 To establish that the court erred by refusing to give the charge they requested, defendants rely principally on United States v. Abelis, 146 F.3d 73 (2d Cir. 1998). In Abelis, we considered an extortion instruction that, in defining fear, did not state that the defendant must act wrongfully. See id. at 82. Although we said that "to avoid question, it would have been better" if the district court had included the notion of wrongfulness in its definition of fear and had explained that the defendant must be aware of a victim's fear in order for the defendant's exploitation of that fear to be wrongful, we did not reverse because the district court clearly indicated in other places that the inducement or exploitation of fear must be wrongful. Id. at 84. The court in this case instructed the jurors that defendants' use of fear must be wrongful when it read the indictment, when it summarized the government's position, and, most importantly, when it set out the elements of a Hobbs Act violation. It was under no obligation to further emphasize the wrongfulness element in response to the jury's questions on elements of fear other than wrongfulness. The court also, in effect, charged that the defendants must be aware of the fear that they exploited by charging that "the law prohibits knowingly and willfully attempting to exploit existing fear."
 
 
 54
 Defendants also argue, relying on United States v. Garcia, 907 F.2d 380 (2d Cir. 1990), overruled on other grounds, Griffin v. United States, 502 U.S. 46, 57n.2, 112 S. Ct. 466, at 473 n.2, 116 L. Ed. 2d 371 (1997), that the court erred when it instructed the jury that Defoe's rational self-interest was irrelevant to the issue of extortion.[3] In Garcia, we reversed the Hobbs Act convictions of former Congressman Robert Garcia and his wife. Garcia offered his influence to a corporation in return for a job for his wife. Id. at 382-83. We found that there was no evidence of the "fear" element of extortion and that Garcia's victim had the mindset of "a shrewd, unethical businessman who senses and seeks to capitalize on a money-making opportunity." Id. at 383. Garcia thus involves a very different factual scenario from this case. Instead of offering access to influence, defendants offered freedom from violence, property damage, and costly shutdowns. Therefore, fear logically co-existed with rational, economic self-interest in this case, and the court's instruction could not confuse the jurors.
 
 C. Stipulation
 
 55
 Carnes argues that the court erred when it allowed the jury to rehear a tape in which Carnes and another BFB member threatened to shut down a job site without also rereading a stipulation stating that the job site never was shut down. Because the jurors did not request the stipulation and a threat is sufficient for Hobbs Act culpability, the district court did not err.
 
 IV. Jurors' Requests to Be Excused
 
 56
 After the charge but before the jury began deliberating, Juror No. 11 asked whether she could be excused because of severe financial hardship. She explained that her employer was no longer paying her for her time at trial. The judge responded that he had called her employer repeatedly and thought she was satisfied. The juror then indicated that she understood her boss didn't have a problem with her attendance at trial but that she was refusing to pay her salary. She said, "I don't think that it is fair for me to be on this case having this burden on myself. I don't think it is fair to the defendants that [are] on trial." Judge Casey told the juror that he could not excuse her and that he would try to "straighten out the problem as far as your getting paid by your employer for the time that you are out." None of the defendants requested additional inquiry or requested that the juror be excused, and the juror did not protest further.
 
 
 57
 The following afternoon, Friday, December 11, 1998, after deliberations had commenced, Johnson's attorney asked that Juror No. 11 be excused because it appeared that deliberations would last for a long time and he was concerned that Juror No. 11 would cave in to the pressure of the other jurors in order to relieve her own financial pressure. The other defense counsel declined to take a position on this request. The district court denied Johnson's request with leave to renew following the court's weekend adjournment if the jury had not reached a verdict. Johnson did not renew his request on Monday or thereafter.
 
 
 58
 On the fifth day of deliberations, December 16, 1998, shortly before 2:30, Juror No. 12 requested to be excused, saying:
 
 
 59
 In the beginning when we did the voir dire I told you that I'm a freelancer and that I don't get paid nine to five. Right now I have an eviction notice from my apartment complex, so if I'm staying, if the jurors do not come up with a verdict today I would like to be excused.
 
 
 60
 Judge Casey took a copy of the eviction notice, said he would try to help, and told the juror he couldn't excuse him right then. None of the defense counsel objected or asked that the court make a further inquiry. The jury returned its verdict a half hour later.
 
 
 61
 A court's decision as to whether "just cause" exists to excuse a juror after jury deliberations have begun is subject to review for abuse of discretion. United States v. Reese, 33 F.3d 166, 173 (2d Cir. 1994). The issue of what, if any, inquiry must be made before deciding whether a juror should be excused also is committed to the judge's discretion. Id. This court need only satisfy itself that the district court had sufficient information to make an informed decision. Id.
 
 
 62
 As to Juror No. 11, the court did not abuse its discretion for several reasons: first, when the juror expressed her concerns, the court promptly said it would attempt to resolve them but could not excuse her immediately; second, the juror did not protest further or ask to be excused again; third, counsel did not initially ask that she be excused or ask the court to conduct an inquiry; fourth, when counsel for Johnson asked that the juror be excused the next day, the other counsel declined to join his request; and fifth, although the court invited Johnson to renew his request on the next trial day, Johnson did not do so. It is apparent that the defendants gambled that Juror No. 11 was more likely to help them than hurt them and object now only because they were convicted. The rationale for upholding the district court's discretion as to Juror No. 12 is even stronger because defense counsel never indicated that they wished the court to excuse this juror.
 
 
 63
 V. Judicial Intervention and Prosecutorial Misconduct
 
 
 64
 Defendants argue that Judge Casey intervened excessively and that this case should be remanded to a different judge because of the excessive interventions, the district court's other errors, and its unduly harsh sentencing.
 
 
 65
 "Reversal for judicial bias is appropriate only where an examination of the entire record demonstrates that the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." United States v. Salameh, 152 F.3d 88, 128 (2d Cir. 1998) (internal quotation marks omitted). After reviewing the entire record, we conclude that defendants have not made the required showing and therefore reject their argument.
 
 
 66
 Hunter argues that the government committed prosecutorial misconduct by implying in summation that Hunter was involved in a shooting at the Union Street site. He also contends that the government impinged on his Fifth Amendment rights by claiming that certain government contentions were undisputed. Neither contention is persuasive. The jury heard a tape in which Hunter promised to "bark on" a rival coalition leader who was causing trouble at the site as well as testimony that there was a shoot-out at the site and that Johnson rewarded Hunter by ordering that his workers be placed at the Union Street site. Because a reasonable juror could interpret this evidence as demonstrating Hunter's involvement in the conspiracy surrounding the shooting, the prosecution was entitled to comment on it.
 
 
 67
 It is only improper for the government to characterize its proof as uncontradicted "where the Government's evidence on a material issue in dispute could be rebutted solely by defendant's testimony." United States v. Hart, 407 F.2d 1087, 1090 (2d Cir. 1969). Defendant fails to show that the AUSA's comments related to disputed issues or to evidence that could be rebutted only by his testimony. Therefore, this argument also fails.
 
 VI. Sufficiency of the Evidence
 A. In General
 
 68
 "A defendant challenging the sufficiency of the evidence must demonstrate that viewing the evidence in the light most favorable to the government, . . . no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." Taylor, 92 F.3d at 1333 (internal quotation marks omitted). We must be especially deferential when reviewing a conspiracy conviction. Id. "The existence of and participation in a conspiracy may be established through circumstantial evidence[, but] there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992) (internal quotation marks and citation omitted). Here, the government had the burden of proving each element of the charged conspiracy - that is, that the defendants agreed to extort money or property from contractors by means of the wrongful use of actual or threatened force or violence or by instilling fear of loss of property or physical injury in their victims and that the labor exception does not apply - beyond a reasonable doubt. 18 U.S.C. 371, 1951(b); Taylor, 92 F.3d at 1333.
 
 
 69
 The government's evidence met its burden of proof on each of the elements of the charged conduct. A brief outline of the testimony and pertinent exhibits -- viewed as we must in the light most favorable to the government and drawing all reasonable inferences in favor of the government - demonstrates that it included proof that the conspiracy to extort targeted at least seven different companies; at least some of those companies gave jobs to coalition members because they feared economic loss and/or physical injury; the defendants' activities did not fall within the labor exception; and each of the defendants knowingly joined and participated in the conspiracy.
 
 1. Defoe Corporation
 
 70
 Between 1995 and 1997, Defoe Corporation ("Defoe") reconstructed the Gowanus Prospect Expressway in Brooklyn. The corporation obtained "protection" from the Gambino crime family in exchange for money and jobs. BFB also demanded jobs from Defoe, and the Gambino family ultimately agreed that BFB could have a coalition coordinator position and two laborer slots. Carnes acted as the coalition coordinator, received approximately $ 700 a week from Defoe, and did not come to the site unless Defoe called about a coalition problem.
 
 
 71
 This agreement among the Gambino family, Defoe, and BFB came about after a series of meetings during the spring and summer of 1995. John Amicucci, Defoe's owner, told Craig Depalma, a Gambino associate, in the presence of William Marshall, another Gambino family member and a cooperating witness, that BFB was pressuring Defoe to hire unnecessary workers. Later, Depalma, Marshall, Amicucci, and McCall met at Defoe's headquarters. Amicucci told McCall that he would have to "go through" Depalma with coalition business, and Depalma warned McCall that Depalma was "with" the son of the "guy that's [in] the 22 hour lock up," which the government asserts was a reference to John Gotti, Jr. McCall responded that he had his own godfather and "what he tells me is what I do." After McCall asked Amicucci to use his influence to get another individual to buy supplies from McCall, he left the meeting with Carnes.
 
 
 72
 Marshall had an opportunity to meet McCall's "godfather," appellant Johnson, at a summer meeting at the Baychester Diner in the Bronx. Carnes also attended this meeting, along with Craig Depalma and his father Gregory Depalma. Gregory Depalma told Johnson that the Gambino crime family controlled Defoe and that Craig was attending the meeting "directly on John Junior's behalf." After a private meeting between the Depalmas and Johnson, the Depalmas told Marshall that they had agreed to work with BFB but that Johnson could place only two laborers and one no-show paid coordinator at each site.
 
 
 73
 Some time thereafter, the Depalmas began to suspect that Carnes was pressuring Amicucci to hire more workers than their agreement allowed. At a second meeting, Johnson told the Depalmas that he would take care of the situation. Carnes and Craig Depalma subsequently worked together to control the flow of jobs to BFB.
 
 
 74
 According to the supervisor for all Defoe projects, Edward Schluter, Defoe hired coalition workers not because the company needed workers but because failure to hire them would result in "having either a person hurt, having my equipment damaged[,] or having work stopped."
 
 2. Halmar Builders
 
 75
 During their second meeting with Johnson and Carnes, the Depalmas told Johnson that Marshall, whom the Depalmas had placed at Halmar Builders as a coalition coordinator, was having trouble with rival coalitions. Carnes suggested that if Marshall got him a "no-show pay" job and put a couple of his men to work, Carnes would take care of the situation. Because Marshall left Halmar, he did not get Carnes the promised job although he did hire one of Carnes' men.
 
 3. Tully Construction
 
 76
 Johnson served as Tully Construction's coalition coordinator and referred to it as his "bread and butter." In 1990, McCall came to Tully Construction's Brooklyn Resurfacing project with twenty to thirty people, encircled field supervisor James Tully, and began chanting "we want jobs." Although Tully feared for his safety, he told McCall, who he did not realize was associated with Johnson, that he could not hire anyone without speaking to Johnson. Tully then called Johnson who asked to speak to McCall. After McCall and Johnson talked, McCall and his followers left the scene. Johnson later told Tully to hire one of McCall's workers, and Tully complied.
 
 
 77
 Tully also used McCall as coalition coordinator on a project he directed on Eastern Parkway and employed "quite a few" of McCall's men there.
 
 
 78
 Jan Szumanski, Tully Construction's superintendent at its Union Street, Queens, site, hired two workers at Johnson's direction, although he needed neither worker, because "sometimes . . .they stop the job, they push the people around." Subsequently, he laid one of the workers off, and hired another laborer, believing that BFB had sent him to replace the worker he had fired. However, the fired worker actually came from a coalition headed by a man known as "Love," and the replacement worker belonged to a coalition run by Robin Laborde, also known as Bodyguard. On May 21, 1996, Szumanski called Johnson and reported that Bodyguard had come to the site. Bodyguard indicated that he was willing to deal through Johnson but asked Johnson to do something for him. Johnson refused, saying, "I gotta put my peeps, peeps there first." Later, Johnson told Szumanski that Love was not to put anyone on the job. When Szumanski expressed a fear of violence on the site, Johnson responded that if "they want to act stupid, then . . . everybody can act stupid." The next day a general manager at Tully told Johnson that someone had come to the site and "threatened the shit out of" Szumanski. Johnson assured the general manager that he would take care of the situation.
 
 
 79
 On May 28, 1996, Johnson learned from Vernon Smith, a BFB leader, that Szumanski hired Bodyguard's man because he believed that he was the replacement for Love's fired worker. Johnson then called Bodyguard who blamed Love for threatening Szumanski. Johnson accused Bodyguard of secretly working with Love to pressure BFB but nevertheless allowed Bodyguard to place one man at the job and told Szumanski to lay off Love's man. Later that day, Johnson told Smith that he suspected Love and Bodyguard were working together, and Smith advised Johnson to "knock everybody off the motherfucking job."
 
 
 80
 On June 3, 1996, Szumanski told Johnson that he had been forced to keep one of Love's workers after Love stopped the Union Street job for half an hour. Johnson told him to lay off Love's worker. Ten minutes later, Johnson warned Love, "I'm gonna do what I gotta do," and Love responded in kind. On the same day, Johnson told McCall that Love claimed McCall had authorized the hiring of Love's worker. He later explained to Smith that he was "trying to push [McCall] into the mix." Smith questioned the necessity of involving McCall because the "twins" would take care of it. Minutes later, Johnson spoke to Daniel Hunter, who has a twin brother named Rodney. The two agreed that it was useless to try to negotiate with Love, and Hunter said, "I see that nigger tomorrow, I'm gonna bark on that nigger. Him and all of them. Whoever he with." Johnson told Hunter that he could replace the coalition workers at the site with his own workers.
 
 
 81
 The next day there was a shoot-out at the site. Police officers arrived too late to apprehend the perpetrators, but an hour later a detective heard Smith say into a pay telephone, "knock both of them off and put Tyborne's [Daniel Hunter's] people in." After the shootout, there were no further problems at the Union Street site, and Johnson continued to act as coalition coordinator.
 
 
 82
 During spring 1997, Tully hired a man from a minority coalition in Red Hook. He was also pressured by Tyborne and Powerful (Rodney Hunter) to hire one of their men. Unaware that Tyborne and Powerful worked for Johnson, Tully asked Johnson to intercede. Johnson directed Tully to hire Tyborne's man. Later, Tully laid off the minority worker from Red Hook and hired another of Hunter's men.
 
 
 83
 The Hunter twins also stopped work at Tully's McGuinness construction project in 1998. As a result and after speaking to Johnson, Tully agreed to hire one of Hunter's coalition members.
 
 
 84
 4. HHM Associates, Inc.
 
 
 85
 McCall acted as the coalition coordinator for HHM Associates, Inc., in Brooklyn, and Eric Mulder occupied the same position in Queens. In addition, HHM contracted with a firm associated with Johnson's son and Vernon Smith for security guards.
 
 
 86
 Jesse Callender, a BFB leader, recruited Mulder to work for BFB after Mulder went into hiding to avoid the consequences of an incident in which he shot an organizer of his coalition in the face. In 1995, Mulder attended a series of meetings with BFB and other coalitions to seek approval to act as HHM's coalition coordinator in Queens. First, he met with McCall and Callender and told them he wanted "to take responsibility for . . . Brooklyn Fight Back's interests for HHM in Queens." He then met with Carnes and "Blacko," who was associated with a rival coalition controlled by Callie Harris. Carnes told Mulder that he would check with other members of BFB, and Blacko did not object to Mulder's request. At a third meeting, which Johnson, McCall, Smith, Callie Harris, Blacko, and Harvey Lyons, one of the owners of HHM, attended, McCall told Lyons that Mulder would be the new coalition coordinator in Queens.
 
 
 87
 A few weeks later, Mulder went to HHM's office. McCall, Callender, and Lyons were also present, and the next week, Lyons told Mulder to bring some workers with him to the job site. Mulder selected one or two workers for each of HHM's Queens work sites. Ordinarily, Mulder required those workers to pay him dues of approximately $ 100 per week. He also received a $ 1000 weekly salary from HHM. In order to protect the job site from rival coalitions, Mulder instructed one of his workers to bring a gun to the job site.
 
 
 88
 Harris' coalition caused problems for Mulder during his entire tenure in Queens. Mulder repeatedly told McCall, who he considered to be his supervisor, that Harris' men "kept coming around and aggravating the job site, stopping the job." Harris' men also had caused problems for BFB in Brooklyn, and, on one occasion, Johnson left instructions for Carnes to go to an HHM construction site in Flatbush and "take care" of the problem. Mulder also reported his problems to Johnson. On May 16, 1996, Mulder told Johnson that Harris' coalition was "coming around," seeking "leverage," and Johnson directed Mulder to straighten out the rival coalition. A week later, Mulder reported to Johnson that "these motherfuckers from fucking Cali [sic] . . . they come over there and stopped the job site today." Mulder added, "I'm out there with my fucking machine gun early in the morning. And if I come kill a motherfucker I'm solving somebody else's problem." Shortly after this exchange, Johnson got off the phone. Johnson called Mulder back a week later and said, "street shit is street shit. I don't want to get involved with . . . And when you talk to me on the phone some kind of way, I don't like it." In the interim between the two calls, Smith had instructed Mulder not to discuss violence on the phone because some coalition phones had been tapped. Mulder explained that the second phone call between him and Johnson had been staged to create the impression Johnson was not involved with violence.
 
 
 89
 On September 17, 1997, Mulder went to an HHM work site in Queens Village with BFB member David Pough and another man. There, Mulder learned that members of Harris' coalition including Erick Riddick, also known as Chaos, Blacko, and Biggie had been at the site and planned to return. When Riddick and Blacko returned with "a crowd of people," they told Harvey Lyons that he should not deal with Mulder and began taking tools from the HHM workers. They also surrounded Mulder, and Blacko told Riddick to grab Mulder. Riddick put Mulder in a headlock, began punching him, and took some of his jewelry. Shots then rang out, and the crowd dispersed. Mulder saw Pough and Jamal Richardson, a BFB member who worked at the site, holding Riddick at gunpoint. Mulder took the gun, pointed it at Riddick, and "shot him until he was unrecognizable." Mulder admitted that as he shot Riddick, he "thought about making it possible [for him] not to be able to come back."
 
 
 90
 After the shooting, Mulder went back into hiding. While in hiding, he spoke to Callender who told him there was a fee for the murder and Mulder should contact Johnson.
 
 5. Frantellizzi Construction
 
 91
 Carnes and other BFB members planned a work stoppage at Frantellizzi because the company allegedly had laid off one of Carnes' employees.
 
 6. Felix Construction
 
 92
 Hunter controlled Felix Construction for BFB.
 
 7. Sullivan & McGrath
 
 93
 During the summer of 1997, Dennis McGrath, the president of Sullivan & McGrath Construction wanted to obtain protection for one of his Queens sites. A subcontractor recommended that McGrath speak to Tony Nestor. Nestor told McGrath that in return for $ 1500 per month, he would provide protection. McGrath also hired some of Nestor's coalition members. In late August, Nestor came to the site with Hunter, who had a gun in his pocket.[4] After being told McGrath was unavailable, Hunter told Frank Fallon, the job foreman at the site that he "better get McGrath on the mother fucking phone right now" or he would have a "problem." McGrath spoke to Hunter, and the two agreed to a meeting. After consulting with the police, McGrath wore a recording device to the meeting, which Hunter, Nestor, Fallon, and several of Hunter's and Nestor's men also attended. When McGrath accused Hunter of bringing a gun to the work site the previous week, Hunter denied it and said to Fallon, "wasn't [I] polite?" Hunter also complained that he was due $ 4500 in payments, not just $ 1500. Police officers broke up the meeting shortly thereafter.
 
 8. Summary
 
 94
 This evidence of defendants' activities at many work sites, the fear that contractors had of coalitions in general and BFB in particular, coalition members' use of violence, and conversations among the various defendants planning tactics against contractors and rival coalitions, coupled with expert and lay testimony indicating that coalition activities did not increase minority representation at job sites and that the coalition laborers hired were unnecessary, gave the jury an ample basis to conclude beyond a reasonable doubt that (1) each of the defendants conspired to extort money and jobs from various contractors by causing them to fear loss of income, damage to their property, and physical injury and (2) the defendants' activities did not fall within the labor exception to Hobbs Act liability.
 
 
 95
 Although defendants emphasize different evidence and attack the credibility of Mulder and Marshall, both of whom have long criminal records, and of Schluter, who obtained immunity from a perjury charge by testifying against the defendants, their arguments do not support reversal because, by making the inferences the government suggests and crediting the government's witnesses and other evidence, the jury could have found the defendants guilty beyond a reasonable doubt.
 
 B. Carnes
 
 96
 In addition to attacking the sufficiency of the evidence in general terms, Carnes argues that it is impossible to tell whether the jury's verdict rested on sufficient evidence because (1) the jury's verdict acquitting him of extorting Defoe implies that the jury also found he did not conspire to extort Defoe; (2) there was insufficient evidence for the jury to convict Carnes of extorting certain contractors; and (3) without a special verdict sheet, it is unclear whether the jury found Carnes guilty of conspiring to extort a contractor with respect to whom the government offered sufficient evidence.
 
 
 97
 Carnes' argument is fallacious in several respects. First, the jury's decision to acquit Carnes on the substantive Defoe count does not indicate that it found he did not conspire to extort Defoe because the elements of the two crimes are different. Cf. United States v. Slocum, 695 F.2d 650, 656 (2d Cir. 1982) (holding that because conspiracy to sell unregistered securities to the public employing fraudulent means and the parallel substantive offense had different elements, district court did not err by refusing to charge that acquittal on conspiracy count required acquittal on substantive counts).
 
 
 98
 Second, Carnes' contention that we must reverse because it is impossible to determine from the jury's verdict which contractors Carnes agreed to extort rests on an erroneous reading of Richardson v. United States, 526 U.S. 813, 143 L. Ed. 2d 985, 119 S. Ct. 1707 (1999) and United States v. Garcia, 907 F.2d 380 (2d Cir. 1990). In Richardson, the Supreme Court found that each of the violations constituting a "continuing series of violations" necessary for conviction of a continuing criminal enterprise based on drug offenses was an element of the prohibited crime, id. 526 U.S. at 818-20, 119 S. Ct. 1707, and therefore held that the jury must unanimously agree on each of the predicate violations, id. at 824, 119 S. Ct. 1707. Because the identity of the targets of a Hobbs Act conspiracy is not an element of that conspiracy, see 18 U.S.C. 371, 1951; cf. United States v. Mucciante, 21 F.3d 1228, 1234-35 (2d Cir. 1994) (holding that identity of victim is not an essential element of 18 U.S.C. 479, which forbids knowingly passing fraudulent government bonds), Richardson is inapposite.
 
 
 99
 Carnes' reliance on Garcia also is misplaced. The Hobbs Act indicates that extortion can be accomplished through the "wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. 1951(b)(2). In Garcia, the government proceeded on two theories: that defendants attempted to create fear in their victim and that they extorted money under color of official right. At trial, defendants argued that there was insufficient proof that corporate officials feared an economic loss from the defendants and asked that this theory of guilt be withdrawn from the jury. Garcia, 907 F.2d at 381. We agreed with the defendants that there was no proof the victims feared economic loss, found that defendants preserved their right to appeal by their motion to withhold the fear theory from the jury's consideration, and vacated because we were unable to determine whether the jury based their conviction on a theory for which there was sufficient evidence. Id. at 382-85. Because the government did not argue that the jury could convict Carnes on one of two (or more) theories, Garcia has no application to Carnes' situation. Moreover, the Supreme Court effectively overruled Garcia in Griffin v. United States, 502 U.S. 46, 57 n.2, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991).
 
 
 100
 Carnes also argues that his conviction must be reversed because it was the result of a compromise verdict. We reject this contention as contrary to the established law of this circuit. See United States v. Green, 523 F.2d 229, 235-36 (2d Cir. 1975).
 
 VII. Sentencing Issues
 
 101
 Although the base offense level for extortion by threat of injury or serious damage ordinarily is 18, U.S.S.G. 2B3.2(a), the Probation Department recommended a base offense level of 43 for each defendant based on subdivision (c) of 2B3.2, which mandates this enhanced level "if a victim was killed under circumstances that would constitute murder under 18 U.S.C. 1111 . . . ." The probation officer recommended a further upward adjustment of four levels for Johnson based on his role as leader of BFB. Although the Guidelines call for a life sentence for any person with an offense level of 43 or above, the maximum sentence for a Hobbs Act violation is twenty years. 18 U.S.C. 1951(a). The probation office recommended downward departures for all four defendants pursuant to U.S.S.G. 2A1.1, App. Note. 1, because they did not actually murder Riddick.
 
 
 102
 At sentencing, the court rejected defendants' arguments that the Riddick murder was not conduct attributable to them, that Riddick was not a victim of the conspiracy, and that his killing was not premeditated murder. It also rejected all defendants' requests for adjustments for acceptance of responsibility; Carnes', McCall's, and Hunter's requests for an adjustment for their minor role in the offense conduct; Carnes' request for adjustments based on mitigating circumstances and Riddick's provocation of Mulder; and McCall's and Hunter's requests for downward departures based on extraordinary family circumstances. The court sentenced Johnson to 20 years of imprisonment and the remaining defendants to 17 years of imprisonment. Asked by the government to explain why he sentenced McCall to less than the Guidelines range of 240 months, Judge Casey replied, "the only reason for the departure from that is that the defendant, as is true with Mr. Carnes, played only a slightly lesser role than the leader of the organization, Mr. Johnson." The attribution of Riddick's murder to all defendants increased Hunter's and McCall's sentences from the Guidelines range of 27 to 33 months to 204 months, Carnes' sentence from the Guidelines range of 30 to 37 months to 204 months, and Johnson's sentence from the Guidelines range of 41 to 51 months to 240 months.[5]
 
 A. Riddick's Murder
 
 103
 1. Standard of Review and Government's Burden of Proof
 
 
 104
 We review de novo the district court's interpretation and application of the sentencing guidelines. United States v. Studley, 47 F.3d 569, 573 (2d Cir. 1995). However, we will reverse a factual finding relevant to a sentencing determination only if it is clearly erroneous. United States v. Ruggiero, 100 F.3d 284, 291 (2d Cir. 1996). And, we must "give due deference to the district court's application of the guidelines to the facts." United States v. Molina, 106 F.3d 1118, 1121 (2d Cir. 1997) (quoting 18 U.S.C. 3742(e)).
 
 
 105
 Preliminarily, defendants argue that due process required the government to prove the facts underlying the attribution of Riddick's murder to them beyond a reasonable doubt or, at a minimum, by clear and convincing evidence. In United States v. Watts, the Supreme Court held that a preponderance standard for proving relevant conduct "generally satisfies due process" but left open the possibility that the Due Process Clause might require a higher standard of "clear and convincing evidence" in cases where the "tail" of relevant conduct "wagged the dog of the substantive offense." 519 U.S. 148, 156-57 & n. 2 (1997) (internal quotation marks omitted).
 
 
 106
 In our most recent case on the burden of proof necessary to establish a sentencing factor, we reconciled dicta in earlier cases by holding that the preponderance standard applied to fact finding at sentencing even when the proposed enhancement would result in a life sentence but that the district court could consider a departure pursuant to U.S.S.G. 5K2.0 where there is a "combination of circumstances . . . including (i) an enormous upward adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found by only a preponderance of the evidence." United States v. Cordoba-Murgas, 233 F.3d 704, 708-09 (2d Cir. 2000). Although the district court's sentencing remarks are not completely free from ambiguity, it appears that it appropriately considered defendants' requests for departure on this basis. The court indicated that it would not depart further downward even if it used a clear and convincing or a beyond a reasonable doubt standard. Therefore, we discern no error in the district court's analysis of the applicable burden of proof.
 
 2. Premeditation
 
 107
 The applicable guideline, U.S.S.G. 2 B3.2, provides that "if a victim was killed under circumstances that would constitute murder under 18 U.S.C. 1111," the court should "apply 2 A1.1 (First Degree Murder). " U.S.S.G. 2 B3.2(c)(1). The referenced statute provides that
 
 
 108
 Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree.
 
 
 109
 18 U.S.C. 1111(a).
 
 
 110
 Defendants contend that Mulder acted in the passion of the moment and that his act thus was not murder.[6] Although we have located no precedent from this circuit that defines premeditated or first degree murder, cases from other circuits give some guidance. In United States v. Brown, the court held that "the fact that cruelty or brutality is manifested in a killing will raise an inference of malice and the length of time of premeditation is not material." 518 F.2d 821, 828 (7th Cir. 1975). In addition, threats made before the killing are relevant to a finding of premeditation. See id. (finding that defendant's "statement made before the stabbing about a 'snitch'" had probative value in establishing premeditation). In United States v. Shaw, the court noted that the distinction between first degree and second degree murder was "less than clear" but that "the best that can be said of deliberation is that it requires a 'cool mind' that is capable of reflection, and of premeditation that it requires that the one with the 'cool mind' did, in fact, reflect at least for a short period of time before his act of killing." 701 F.2d 367, 393 (5th Cir. 1983). Ample evidence supports the district court's finding that Mulder committed premeditated murder. For example, Mulder previously had threatened to kill one or more of Callie Harris' men; Riddick was restrained by another man when Mulder shot him; Mulder fired many bullets; and he admitted that he was motivated by a desire not to have Riddick return to the job site. Therefore, the district court properly found Mulder's crime to have been first degree murder.
 
 
 111
 3. Victim Within the Meaning of the Hobbs Act
 
 
 112
 Defendants next argue that Section 2B3.2(c)(1) does not apply because Riddick, as a rival coalition member, was not a "victim" within the purview of the Hobbs Act. This is a legal issue subject to de novo review. Relying on United States v. Napoli, 179 F.3d 1 (2d Cir. 1999), cert. denied, 528 U.S. 1162, 145 L. Ed. 2d 1084, 120 S. Ct. 1176 (2000), defendants first argue that the victim referred to in Section 2B3.2(c)(1) must be a direct and not an indirect victim of the extortionate scheme. Napoli is inapposite because it construed U.S.S.G. 3D1.2, which refers to "the same victim" while the Hobbs Act guideline refers to "a victim." Id. 179 F.3d at 7. Alternatively, defendants argue that even though "a victim" may not deserve the narrow construction accorded to "the victim" by Napoli, it is less inclusive than "any victim," as that phrase was construed in United States v. Muhammad, 948 F.2d 1449, 1455-56 (6th Cir. 1991) (applying enhancement for bodily injury to "any victim" to robber who assaulted police officer attempting to restrain him during his get-away). In appellants' view, "a victim's" place on the continuum between "any victim" and "the victim" may support application of 2B3.2(c)(1) if a direct target of extortion or an innocent bystander is killed but not if a rival coalition member is killed. We disagree. If it were not for BFB's extortionate purpose and need to control the Queens site, Mulder would not have come to the site to confront Callie Harris' gang and therefore would not have shot Riddick. In Muhammad, the court said, "one must understand the term 'victim' in the context of the crime committed." Id. at 1456 n.1. In extortion, the term "a victim" is most reasonably construed to include all persons killed to carry out the extortionate scheme, a reading that includes Riddick, who was killed to maintain BFB's control over the HHM sites in Queens. Therefore, we agree with the district court that Riddick was "a victim" of that portion of the conspiracy that related to the Union Street site.
 
 
 113
 4. Scope of the Agreement and Reasonable Foreseeability
 
 
 114
 "Under the relevant conduct principles of subsection 1B1.3(a)(1)(B), all reasonably foreseeable acts . . . of others in furtherance of [a] conspiracy may be taken into account to determine a defendant's sentence." Molina, 106 F.3d at 1121 (2d Cir. 1997) (internal quotation marks omitted). However, the district court must make two particularized findings. First, it must determine "the scope of the criminal activity agreed upon by the defendant." Studley, 47 F.3d at 574. Second - and only if it finds that the scope of the activity to which the defendant agreed was sufficiently broad to include the conduct in question -- the court "must make a particularized finding as to whether the activity was foreseeable to the defendant." Id. In Studley, we identified several principles and factors relevant to determining the scope of jointly undertaken criminal activity. Mere "knowledge of another participant's criminal acts" or "of the scope of the overall operation" will not make a defendant criminally responsible for his co-defendants' acts. Id. at 575. Also, it is more likely that an activity has been jointly undertaken if "the participants pool their profits and resources" and do not work independently. Id. Another sign of a joint undertaking is "the defendant['s] assistance in designing and executing the illegal scheme." Id.
 
 
 115
 The government agrees that the district court may not have made sufficiently particularized findings on the scope of the individual defendants' agreements and consents to a remand for this purpose but argues that the scope of each defendant's agreement was broad enough to cover Riddick's murder. To support its argument, the government relies principally on the assistance that coalition members rendered each other and Johnson and McCall's roles as "supervisors" of Mulder.
 
 
 116
 There is evidence in the record that both McCall and Johnson entered into a joint agreement with Mulder to eliminate Callie Harris' gang as a threat at HHM's Queens work site. A recording demonstrates that Mulder informed Johnson of his intent to kill someone at that site. And, the court could choose to believe Mulder's testimony that Johnson's later attempt to disassociate himself from any such plan was a sham. Mulder also testified that he viewed McCall as his supervisor, that McCall frequently visited the site, that McCall introduced him to Harvey Lyons as the new coordinator of the Queens site, and that Mulder told McCall about his problem with Callie Harris' coalition. From Johnson's and McCall's conversations with Mulder, the district court reasonably could find that they jointly planned methods to take control of the Queens site, albeit not specifically the murder of Riddick. Because a reasonable fact finder could find, but would not be required to find, that McCall and Johnson entered into a joint agreement with Mulder to maintain control of the Queens work site, we vacate their sentences and remand to allow the district court to make particularized findings with respect to each on the scope of their agreement.
 
 
 117
 We find no evidence, direct or circumstantial, that Hunter's agreement with other BFB members extended to the Queens work site. Therefore, we vacate Hunter's sentence and remand for resentencing at an offense level that does not take into account Riddick's murder.
 
 
 118
 The only evidence that associates Carnes with the Queens site is his promise to Mulder to check with members of BFB to see whether Mulder would be acceptable as the site's coordinator and his attendance at meetings with Mulder that members of Harris' coalition also attended. As a matter of law, this conduct is not sufficient to indicate that Carnes agreed to help control the Queens work site. See Studley, 47 F.3d at 576. Therefore, we vacate Carnes' sentence and remand for resentencing without consideration of Riddick's murder.
 
 
 119
 If the district court finds on remand that the scope of Johnson's or McCall's agreement was broad enough to encompass Riddick's killing, that defendant or those defendants will have the burden of demonstrating Mulder's conduct was not foreseeable to them. United States v. Martinez-Rios, 143 F.3d 662, 677 (2d Cir. 1998). Because we are remanding, we add that the district court's original basis for finding foreseeability - the use of violence by coalition members in other circumstances - was inadequate. Our cases contemplate a closer link. See United States v. Franklyn, 157 F.3d 90, 98 (2d Cir. 1998) (affirming district court's conclusion that co-defendant's possession of a machine gun was foreseeable to sentenced defendant where he carried the ammunition for the gun in question); Martinez-Rios, 143 F.3d at 674-78 (upholding scheme's mastermind's responsibility "for a substantial portion of his co-conspirators' tax losses" where he had "direct personal involvement in the evasion of taxes by [his co-defendants]" and also upholding less culpable defendants' offense level reflecting co-defendants' losses because they shared specific tax evasion mechanisms and pooled resources) (internal quotation marks omitted); United States v. Medina, 74 F.3d 413, 417 (2d Cir. 1996) (upholding relevant conduct adjustment for use of firearms where defendant knew co-conspirator intended to carry a gun and defendant masterminded the robbery); United States v. Tapia-Ortiz, 23 F.3d 738, 743 (2d Cir. 1994) (holding that defendant's involvement in cocaine transaction was not sufficient to hold him liable for proposed heroin transaction where only evidence was co-conspirator's alleged ambiguous statement to government agent indicating that defendant also would be the buyer in the heroin transaction and even this statement was contradicted by other portions of agent's testimony). On remand, the district court may not find that Riddick's murder was foreseeable to McCall or Johnson solely because BFB members committed other violent acts.
 
 B. Miscellaneous Sentencing Issues
 
 120
 We have reviewed all of the defendants' remaining contentions concerning sentencing and find that they lack merit.
 
 CONCLUSION
 
 121
 For the reasons discussed, we affirm the defendants' convictions but vacate their sentences and remand for resentencing consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 See II(A) below.
 
 
 [2]
 The labor exception assumes that the employer genuinely needs workers but has decided to hire non-union or non-minority workers. If the coalition creates not only the spur to hire a minority worker but also the need to hire an otherwise unneeded worker or coordinator by its violence or threats of violence, its actions do not fall within the labor exception.
 
 
 [3]
 Although the jury acquitted defendants on the Defoe count, defendants argue that the prejudicial instruction would have spilled over to the jury's consideration of the conspiracy count.
 
 
 [4]
 Hunter vigorously disputes the contention that he had a gun in his pocket, but a jury fairly could have credited Fallon's testimony and inferred that Hunter did have a gun in his pocket.
 
 
 [5]
 Johnson's calculation is higher than the others due to a four level adjustment for his role in the offense, and Carnes' sentence is higher than McCall's or Hunter's because he was in Criminal History Category II rather than Criminal History Category I.
 
 
 [6]
 In an argument adopted by the other defendants, Carnes also argues that in order to hold him responsible for premeditated murder, the court had to find that he had a premeditated intent to cause Chaos' death. This argument relies on United States v. Fortier, 180 F.3d 1217 (10th Cir. 1996). The Fortier court held that the district court erred by sentencing Fortier pursuant to U.S.S.G. 2A1.1 because the government did not claim that Fortier, himself, acted with knowledge or intent that the weapon he possessed would be used to kill. Id. at 1226. The district court had resorted to Section 2A1.1 because of a cross-reference in Section 2K2.1(c)(1). Id. 180 F.3d at 1224. Unlike Section 2B3.2(c)(1), Section 2K2.1(c)(1) specifically requires that the defendant being sentenced know that the firearm or ammunition he used or possessed will be used in the commission of another crime. Therefore, Fortier is not relevant.